**ALASKA INTERNATIONAL CONSTRUCTORS and Employers Casualty Company, Appellants,**

v.

**STATE of Alaska, SECOND INJURY FUND, Appellee.**

No. S–1873.

Supreme Court of Alaska.

May 13, 1988.

James F. Klasen, Gary W. Gantz, Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage, for appellants.

Jan Hart DeYoung, Asst. Atty. Gen., Anchorage, Grace Berg Schaible, Atty. Gen., Juneau, for appellee.

Judy B. Bell, Patricia L. Zobel, Staley, Delisio, Cook & Sherry, Anchorage, and Michael Barcott, Faulkner, Banfield, Doogan & Holmes, Anchorage, as amicus curiae.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

BURKE, Justice.

This workers' compensation case involves the interpretation of the Second Injury Fund statute, AS 23.30.205. The Alaska Workers' Compensation Board (Board) denied Alaska International Constructors' request for reimbursement from the fund for benefits it pays to an injured employee, Oscar Kinter. The Board construed AS 23.30.205(c) strictly, and concluded that the employer failed to establish by written records that it had knowledge of Kinter's preexisting impairment.[1] Alaska International and its insurer appealed the Board decision to the superior court, and Judge Peter Michalski affirmed. In this appeal, both Alaska International and the Second Injury Fund agree that the only statutory section at issue is the written records requirement in subsection (c); all other statutory requirements for Second Injury Fund relief have been met.

Because we find that the proffered documents are insufficient to satisfy the statutory written records requirement, we affirm the Board and superior court.

## I. BACKGROUND

On February 9, 1983, while Oscar Kinter was working for Alaska International, he injured his back while pushing some equip-ment. The Board ruled that Kinter is permanently totally disabled as a result of his back condition, and Alaska International has been paying him workers' compensation disability payments since this injury occurred. Prior to this injury, Kinter had had a history of back trouble. His first work injury occurred in 1975, with repeated injuries in 1976 and 1978. He had undergone two back surgeries; the first was in 1975, and the second in 1979.[2] Following the second back operation, Kinter's doctor estimated that he had a 40% permanent partial impairment.

Kinter had been dispatched by his union, the International Union of Operating Engineers, Local No. 302, to a welding job with Alaska International at Prudhoe Bay. The union had a contract with Alaska International whereby the union agreed to furnish all the "qualified workmen" which Alaska International might require, and Alaska International agreed to "exclusively use the services of such hiring hall." The union maintained certain records of its members. When it dispatched Kinter, it had in its possession a memo, dated June 19, 1980, stating that Kinter "fell (slipped) out of truck while unloading iron and a large piece fell on him injuring [his] back. Has had 3 surgeries since on his back." This document was, at all relevant times, in the union's possession.

The second document on which Alaska International relies to help it meet the statutory written records requirement is Kinter's resume. The resume states in part:

I was injured on the job by a sheet of iron. I was put on medical leave and came back to Anchorage. My injury has been corrected by surgery and I was released with no restrictions by my doctor to return to work.

According to Kinter, he submitted a copy of this resume to Alaska International prior to his injury; however, there is no other

---

1. AS 23.30.205(c) provides:
   In order to qualify under this section for reimbursement from the second injury fund, *the employer must establish by written records that the employer had knowledge of the permanent physical impairment before the subsequent injury* and that the employee was hired or retained in employment after the employer acquired that knowledge.
   (Emphasis added).

2. Kinter had a third back operation in June, 1983, after the injury at issue here.

evidence that anyone at Alaska International ever saw the resume or that Alaska International ever had it in its files.[3]

Following Kinter's February 9, 1983 injury, Alaska International filed a petition for reimbursement from the State of Alaska, Second Injury Fund, pursuant to AS 23.30.-205. The fund administrator denied relief; Alaska International then petitioned the Board, which also voted to deny relief based upon the written records requirement. They found that the statute should be strictly construed, and neither Kinter's resume nor the union records "show[ed] knowledge of a qualifying permanent physical impairment."[4] Alaska International and its insurer appeal the superior court's affirmance of the Board's decision.

## II. DISCUSSION

The purpose underlying the Second Injury Fund is to remove obstacles to the employment of the partially disabled. It is meant to remove disincentives to hiring physically impaired workers by making an equitable adjustment of the liability assumed by an employer hiring such a person. *Employers Commercial Union Insurance Group v. Christ*, 513 P.2d 1090, 1093 (Alaska 1973). It also diminishes the inequity inherent in the last injurious exposure rule, which in many cases imposes a disproportionately higher burden of liability on the last employer. *Ketchikan Gateway Borough v. Saling*, 604 P.2d 590, 598 (Alaska 1979). The fund reimburses qualifying employers for compensation payments to disabled employees after 104 weeks if the employee's preexisting impairment, combined with the subsequent inju-

ry, results in compensation liability substantially greater than would have resulted had the preexisting impairment not existed. AS 23.30.205(a). In theory, this equalizes the cost of workers' compensation insurance premiums for able-bodied and partially disabled workers. *Alaska Workmen's Compensation Board v. H & M Logging*, 492 P.2d 98, 100 (Alaska 1971). In order to obtain fund reimbursement, an otherwise qualified employer must establish by written records that it had knowledge of the employee's preexisting permanent physical impairment before the subsequent injury occurred, and that it retained the employee despite his injury. AS 23.30.205(c).[5]

The issue here is whether Alaska International established its knowledge of Kinter's preexisting impairment by written records, as required by AS 23.30.205(c).

### A. *The Union Record*

The Board considered both the resume and the union documents in determining whether Alaska International met the written records requirement. However, the preliminary question is whether the union record can be considered at all.[6] That record was in the union's, not Alaska International's, possession, and Alaska International does not claim to have ever seen the record before Kinter's injury.

Amicus argues,[7] on behalf of Alaska International, that Local No. 302 is a hiring agent for Alaska International by virtue of the collective bargaining agreement. They contend that, at the time the union communicates an Alaska International opening to one of its members, and that member "accepts" the offer, an employment relation-

---

**3.** When Kinter first reported for work at Alaska International, he also told his mechanic foreman, Donald Schliske, that he had previously had back surgery and back problems.

**4.** Because the documents were found to be insufficient, the Board did not answer the question of whether documents in the union's possession should be attributed to Alaska International for purposes of satisfying the statute.

**5.** *See supra* note 1.

**6.** Although the Board did not reach this question, we find it necessary to do so. During oral argument on this matter, counsel for the state

conceded that, if the union records were imputed to Alaska International, those records would in fact satisfy the written records requirement under the test recently articulated in *Sea–Land Services v. State, Second Injury Fund*, 737 P.2d 793, 795 (Alaska 1987) (discussed *infra* p. 10). Thus, the question whether the union records can be imputed is central to this case.

**7.** An amicus brief was filed by two attorneys who represent companies in Alaska that hire from unions.

ship is established. Thus, amicus argues, the union's "knowledge" of Kinter's qualifying disability, as evidenced by its written records, can be imputed to Alaska International for purposes of determining whether Alaska International has met the statutory requirement of AS 23.30.205(c). We do not find this argument persuasive.

■ A union's primary purpose is to organize and secure for its members the most favorable conditions with respect to wages, hours, and other employment concerns. *See* 51 C.J.S. *Labor Relations* § 43 (1967). "[A] labor union is the agent and servant of its members.... Generally, a union represents only its members and not their employer...." *Id.* § 107. Moreover, AS 23.40.030 defines a labor organization as a group organized "wholly or partly to bargain collectively or deal with employers ... concerning grievances, terms, or conditions of employment ... or protection in connection with employees." A labor union's purpose is to further the interests of employees, not the interests of employers. Thus, we cannot conclude that a union, even if it has a hiring arrangement with an employer, is that employer's *agent* for purposes of this statute.

In addition, we see no policy reason to expand the definition of "employer" as used in this statute to include unions. Since a union's purpose is to obtain jobs for its members, it does not have the disincentive to hiring impaired workers that this statute tries to counteract. *See Christ,* 513 P.2d at 1093. A union simply has no reason to communicate information concerning a candidate's physical impairment to a prospective employer. Thus, if the union's knowledge, as evidenced by its written records, is attributed to the employer, the statute's purposes will be frustrated. Even employers who would never knowingly hire a disabled worker would be able to benefit from Second Injury Fund reimbursement. This is clearly contrary to the legislature's intent.[8]

■ We believe that extending Second Injury Fund reimbursement to cases where a *union* has written records establishing its knowledge of an employee's qualifying disability, but the employer does not, would undercut the purposes of AS 23.30.205. Therefore, we hold that the union records should not be imputed to Alaska International.

### B. *The Statutory Requirement*

Having concluded that Alaska International cannot rely on the record that was in the union's possession to establish *its* knowledge, the only written record arguably of consequence is Kinter's resume.

We have recently articulated two purposes served by the written records requirement of AS 23.30.205(c). First, it protects the fund against collusive claims by providing evidence that the employer actually knew of the preexisting impairment, so the statutory purpose is furthered. Second, it avoids the need to litigate whether the employer actually did have knowledge of the preexisting condition. *Sea–Land Services v. State, Second Injury Fund,* 737 P.2d 793, 795 (Alaska 1987).

■ We have noted that "[t]he written record need not contain the exact medical terminology employed in AS 23.30.-205(d)(1)." *Sea–Land,* 737 P.2d at 795. Instead, we interpret the sufficiency of written records under AS 23.30.205(c) according to the following test:

> [A]n employer is entitled to reimbursement from the Second Injury Fund if it produces a written record from which its prior knowledge of the employee's quali-

---

**8.** Amicus cites one Florida case to support its position. In *Special Disability Trust Fund v. Wheeler,* 440 So.2d 460, 461 (Fla.App.1983), the parties stipulated that the employer and union had an "exclusive" referral system, and that the "employment agreement is completed" when the union called upon the employee. Thus, the court found that the employer relied for hiring on the union, the union was the "veritable agent" for that purpose, and the union's knowledge of an impairment was therefore sufficient to satisfy the employer's need for knowledge. *Id.* Here, the parties have entered no similar stipulation; under the agreement, Alaska International had the power to review and reject union referrals. Thus, *Wheeler* is distinguishable.

fying disability can fairly and reasonably be inferred.

*Id.* The only question, then, is whether Alaska International's prior knowledge of Kinter's qualifying disability can fairly and reasonably be inferred from his resume.[9]

We do not believe that an inference of knowledge of a preexisting impairment can fairly be drawn from the resume. It states in relevant part:

> From January, 1978 until July 31, 1978, I was a welder at Service City at Prudhoe Bay for this company.... I worked for this company until I was injured on the job by a sheet of iron. I was put on medical leave and came back to Anchorage. My injury has been corrected by surgery and I was released with no restrictions by my doctor to return to work.

The resume also shows no employment for Kinter between July 31, 1978 and April, 1980. This period of unemployment is not attributed to the injury, or to any other cause. Alaska International argues:

> It can be reasonably inferred from these facts that Mr. Kinter's injury was so severe ... that he was placed on medical leave for twenty months. From the language "hit by sheet of iron" and "surgery," it can be reasonably inferred that he was involved in a substantial impact injury requiring surgery. It can further be reasonably inferred that arthritis would typically develop following such a trauma. It can further be reasonably inferred that Mr. Kinter would suffer permanent disabilities from this injury because it is generally known that surgery is an injury in itself which never restores a patient to the physical condition he was in prior to injury.

In our view, this long chain of inferences fails to meet the fair and reasonable test of *Sea–Land* as a matter of law. The reference to Kinter's injury could reflect any injury which is sufficiently severe to require surgery. One can not infer, without further information, that there will be a permanent impairment.

In addition, the test requires the written records to show knowledge of a "qualifying disability." It is true that the statutory medical terminology is not necessary, *Sea–Land*, 737 P.2d at 795, but the resume's general reference to an "injury" utterly fails to raise the reasonable inference that Alaska International knew of Kinter's arthritis, the preexisting permanent physical impairment upon which Alaska International bases its claim for reimbursement.[10] Alaska International's argument that Kinter's doctor testified that back surgery necessarily results in substantial physical impairment and that Kinter in fact had arthritis misses the point. The issue is not what Kinter's actual condition was, but whether written records establish Alaska International's prior *knowledge* of that condition.

Finally, it cannot reasonably be inferred from the resume that Alaska International knew of a qualifying disability in light of the additional comments contained in that same "record." Not only does the resume state that Kinter was released with "no restrictions," and that his "injury has been corrected," it also prominently states "DISABILITIES: NONE." The resume is insufficient to establish a reasonable inference that Alaska International knew of Kinter's preexisting arthritis.

### III.  CONCLUSION

Written records that were in the union's possession cannot be imputed to Alaska International for purposes of helping it meet the requirement of AS 23.30.205(c). Further, the resume is an insufficient record under *Sea–Land* as a matter of law;

---

**9.**  Our opinion in *Sea–Land* disposes of the alternative issue whether Alaska International's *actual knowledge* of Kinter's condition meets the statutory requirement even if the written records are insufficient. We explicitly rejected that contention, stating "[h]ad the legislature desired to grant reimbursement based on the employer's actual knowledge of the employee's disability, it could have done so." *Sea–Land*, 737 P.2d at 796 n. 3.

**10.**  Arthritis is listed in the statute as one of twenty-seven possible conditions which qualify as a "permanent physical impairment." AS 23.30.205(d)(1)(D).

Alaska International's prior knowledge of Kinter's arthritis cannot fairly and reasonably be inferred from it. Thus we AFFIRM the superior court order affirming the Board's decision.