DOUGLAS F. BAUGHMAN, SR., APPELLEE, V. UNITED-A.G.
COOPERATIVE AND UNITED EMPLOYERS INSURANCE COMPANY,
DEFENDANTS AND THIRD-PARTY PLAINTIFFS, APPELLEES, AND
STATE OF NEBRASKA, SECOND INJURY FUND, THIRD-PARTY
DEFENDANT, APPELLANT.
586 N.W. 2d 836

Filed November 24, 1998.    No. A-98-259.

Don Stenberg, Attorney General, and Martin W. Swanson for
appellant.

Glenn A. Pettis, Jr., for appellee Baughman.

Matthew J. Buckley, of Hansen, Engles & Locher, P.C., for appellees United-A.G. Cooperative and United Employers Insurance Company.

IRWIN, Chief Judge, and SIEVERS and INBODY, Judges.

SIEVERS, Judge.

## INTRODUCTION

In this workers' compensation case, Douglas F. Baughman, Sr., was awarded benefits from his employer, United-A.G. Cooperative (United-A.G.), and its workers' compensation insurer, United Employers Insurance Company. The State of Nebraska, Second Injury Fund (the Fund), was also ordered to pay a portion of the benefits due Baughman pursuant to Neb. Rev. Stat. § 48-128 (Supp. 1997). We address the "written records" requirement of the Second Injury Fund statute, as well as whether an insurer's knowledge about a worker's preexisting disability, by appropriate written records, inures to the benefit of the employer in order to satisfy the written records requirement.

## FACTUAL BACKGROUND

On October 30, 1993, Baughman injured himself while performing his duties as a truckdriver for United-A.G. Baughman was injured when a milk dolly, carrying approximately 80 gallons of milk, smashed into the dolly he was pulling. In an attempt to stop the dolly, Baughman injured his back and left leg. X rays showed severe degenerative changes at multiple levels of Baughman's lumbar spine with spondylolisthesis. Baughman was examined by Dr. Douglas J. Long on November 4, 1993.

On November 12, 1993, Dr. Long performed surgery on Baughman consisting of a microlumbar diskectomy at L3-4. On February 9, 1994, after physical therapy, Dr. Long released Baughman to work with a restriction of no lifting greater than 100 pounds for 4 weeks and then no restrictions. Dr. Long concluded that Baughman would have a permanent impairment and anticipated maximum medical improvement in May.

Baughman returned to work on April 11, 1994. In a letter to United-A.G.'s workers' compensation insurer, dated April 19,

1994, Dr. Long rated Baughman's permanent impairment at 10 percent of the whole person. In August, Baughman had a recurrence of pain in his lower back and legs which led to a second surgery performed by Dr. Long on September 26. The second surgery was an L3 laminectomy, an L4 laminectomy, an L4 foraminotomy, and an L3-4 diskectomy on the left. In a letter to attorney Howard Kaiman, Dr. Long stated that "both surgical interventions are related to the original work related injury as described by Mr. Baughman to me."

On February 28, 1995, Dr. Long released Baughman to work on March 13 at "full capacity, without restrictions; see below." The "see below" was a restriction which provided for "little or no roller stops for 6 months; power jack when needed." It was Dr. Long's opinion that the second operation had created a 2-percent increase in Baughman's previous 10-percent whole body impairment rating.

On April 11, 1995, Baughman sustained another, separate, work-related injury to his lower back as a result of delivering and unloading cases of hams. On June 1, Baughman underwent a third surgery and approximately 3½ months later began physical therapy. However, Baughman continued to be "disabled by his pain." On May 24, 1996, Dr. Long advised Baughman that further surgery would not be of significant benefit. Dr. Long noted, "I do feel that Mr. Baughman is now completely disabled and is not able to return to his work or in any other capacity and would deem him 100 percent disabled at this time."

On January 16, 1997, Dr. Long answered a questionnaire regarding Baughman's injuries, medical treatment, and disability. Dr. Long stated that Baughman's injuries and disability were caused by a work-related accident on October 30, 1993, a recurrence of his first injury in June 1994, and a work-related injury on April 11, 1995. Dr. Long was of the opinion that Baughman suffered a 10-percent permanent partial disability to the whole body as a result of the first injury and surgery, a 2-percent increase in his whole body impairment as a result of the recurrence in June 1994 and surgery on September 26, and a 10-percent increase in whole body impairment as a result of the second injury of April 11, 1995, and surgery on June 1. Dr.

Long concluded that Baughman was permanently and totally disabled and that psychiatric care would be appropriate.

On February 10, 1997, Baughman was evaluated by Dr. Eugene C. Oliveto for depression and emotional problems. Dr. Oliveto stated that Baughman's depression stemmed from his work-related injuries, that Baughman had no preexisting mental or emotional impairment, and that Baughman was totally disabled by his psychiatric impairments alone. About May 22, Baughman underwent a vocational rehabilitation evaluation performed by Alfred J. Marchisio, Jr., a certified professional counselor. It was Marchisio's opinion that Baughman was presently and had been totally unemployable since the accident on April 11, 1995; that prospects for future employment were "virtually nonexistent"; and that Baughman had suffered a 55- to 60-percent loss of earning capacity prior to the last injury on April 11. In a letter to United-A.G.'s attorney, Marchisio stated: "It is my opinion that the percentage of disability caused by the combined disabilities is substantially greater than that which would have resulted from the last injury, i.e., 4/11/95, considered alone and of itself."

## PROCEDURAL BACKGROUND

Baughman filed his petition in the Workers' Compensation Court, and thereafter, United-A.G. filed a third-party petition impleading the Fund. On October 1, 1997, the Workers' Compensation Court trial judge found that Baughman was permanently and totally disabled as a combined result of the two injuries. The trial court determined that $86.25 of Baughman's weekly benefit of $178.57 for permanent and total disability would be paid by the Fund pursuant to § 48-128. The court also specifically found that United-A.G. had met the written records requirement of § 48-128(2).

The Fund sought further review, and on February 12, 1998, the three-judge review panel affirmed the trial judge's order. The review panel also ordered the Fund to pay Baughman $1,500 for attorney fees incurred as a result of the application for review. The Fund timely appealed to this court.

## ASSIGNMENTS OF ERROR

The Fund asserts that the compensation court erred as a matter of law in (1) finding that all requirements of § 48-128 had been met; (2) finding that the Fund was liable for payments to Baughman; (3) failing to reimburse the Fund for certain expenses; (4) awarding compensation to Baughman from the Fund in excess of that to which he would otherwise be entitled from United-A.G.; (5) finding that United-A.G. had sufficient written records to satisfy § 48-128; and (6) not finding that the last injury, standing alone and of itself, was so disabling as to make Baughman permanently and totally disabled.

## STANDARD OF REVIEW

■ A judgment, order, or award of the Workers' Compensation Court may be modified, reversed, or set aside only upon the grounds that (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award. *Bryson v. Vickers, Inc.*, 7 Neb. App. 595, 584 N.W.2d 44 (1998); *Snipes v. Sperry Vickers*, 251 Neb. 415, 557 N.W.2d 662 (1997).

## ANALYSIS

We note at the outset that although the Fund assigns six errors on appeal, it makes three arguments in its brief: (1) United-A.G. did not have sufficient written records to satisfy § 48-128, (2) the last injury standing alone and by itself was disabling, and (3) Baughman's "injury" was not a hindrance or obstacle to his obtaining employment. Errors assigned but not argued will not be addressed. *Van Ackeren v. Nebraska Bd. of Parole*, 251 Neb. 477, 558 N.W.2d 48 (1997). Therefore, we review the workers' compensation award based on the three grounds argued in the Fund's brief as set forth above.

*Written Records Requirement.*

Section 48-128, the Second Injury Fund statute, provides in pertinent part:

(1) For injuries occurring before December 1, 1997:

(a) If an employee who has a preexisting permanent partial disability whether from compensable injury or otherwise, which is or is likely to be a hindrance or obstacle to his or her obtaining employment or obtaining reemployment if the employee should become unemployed and which was known to the employer prior to the occurrence of a subsequent compensable injury, receives a subsequent compensable injury resulting in additional permanent partial or in permanent total disability so that the degree or percentage of disability caused by the combined disabilities is substantially greater than that which would have resulted from the last injury, considered alone and of itself, and if the employee is entitled to receive compensation on the basis of the combined disabilities, the employer at the time of the last injury shall be liable only for the degree or percentage of disability which would have resulted from the last injury had there been no preexisting disability. For the additional disability, the employee shall be compensated out of . . . the Second Injury Fund . . . .

This section also provides that before liability for the "additional disability" may be imposed on the Fund, "the employer must establish by written records that the employer had knowledge of the preexisting permanent partial disability . . . at the time the employee was retained in employment after the employer required such knowledge." § 48-128(1)(b). Thus, to impose liability on the Fund under § 48-128(1)(b), an employer must prove by "written records" that it had actual knowledge of an employee's preexisting permanent partial disability.

In finding that United-A.G. had met the written records requirement of § 48-128, the workers' compensation trial judge reasoned:

Exhibit 26 shows that United was aware of both surgeries resulting from the accident and injury of October 30, 1993 and received progress reports and statements of disability, including restrictions, from Dr. Long. In addition, United produced the testimony of John Treantos, the Director of Insurance for United at the time of said accident and injury

of October 30, 1993. Mr. Treantos testified about his many discussions with Jan Reese, the adjuster for United Employers Insurance Company, regarding the plaintiff's surgeries and permanent disability ratings previously described.

The Fund contends the trial court erred as a matter of law in finding that "those documents and communications constituted written records." Brief for appellant at 9. Specifically, the Fund argues (1) that the trial court erred in relying upon oral statements as a substitute for written records and (2) that exhibit 26 failed to demonstrate the "permanency" of Baughman's disability after the first two surgeries. The Fund asserts: "Simply being aware of a surgery or of an injury cannot be treated the same under the law as [knowing] the extent and permanent nature of the injury." Brief for appellant at 11.

We hold that the trial judge was wrong as a matter of law in relying upon the oral communications between John Treantos, director of insurance for United-A.G., and Jan Reese, claims adjuster for United-A.G.'s workers' compensation insurer, as evidence that United-A.G. had satisfied the statutory requirement that it "establish by *written records* that the employer had knowledge of the preexisting . . . disability." (Emphasis supplied.) § 48-128(1)(b). To hold that conversations between a representative of the employer's workers' compensation insurer and the employer equate to a *written record* does substantial and unacceptable violence to the term "written records." Irrespective of the information imparted, conversations are the functional opposite of a written record.

There is authority for the notion that the written records requirement need not be satisfied in the case of an obvious injury inevitably leading to undisputed actual knowledge on the part of the employer of the employee's preexisting permanent disability. See *Akins v. Happy Hour, Inc.*, 209 Neb. 236, 306 N.W.2d 914 (1981), supplemented by *Akins v. Happy Hour, Inc.*, 209 Neb. 748, 311 N.W.2d 518 (1981) (on issue of attorney fees) (where hired employee's preexisting injury was loss of arm at elbow). The actual knowledge exception for the loss of a limb from *Akins* has never been extended to back injuries. The obvious distinction is that uniform, consistent, and reliable

inferences about the existence of permanent disability cannot be drawn merely from the knowledge that the worker had previously injured his or her back. Thus, while there is evidence that United-A.G. had prior knowledge of Baughman's injuries and treatment, prior to keeping him on at United-A.G. as an employee, the well-known exception to the written records requirement from *Akins* does not apply. However, the trial court's reliance on exhibit 26 must also be examined.

This court recently addressed the written records requirement in *Bryson v. Vickers, Inc.*, 7 Neb. App. 595, 584 N.W.2d 44 (1998). Bryson was awarded benefits from his employer, Vickers, and its workers' compensation insurer. The court ordered the Fund to pay benefits to Bryson pursuant to § 48-128. The Fund argued that Vickers' written records of Bryson's preexisting condition did not satisfy the written records requirement contained in § 48-128.

Among the written records in evidence in *Bryson* were two letters from the physician who performed the surgery on Bryson after his first injury, which occurred on April 10, 1991. The first letter, dated January 9, 1992, stated that Bryson had a 10-percent permanent impairment to his body as a whole. The second letter, dated June 25, 1993, stated that Bryson " 'is functioning at a light physical demand level. I think he can be a valuable employee *if kept at this level.*' (Emphasis supplied.)" *Bryson*, 7 Neb. App. at 601, 584 N.W.2d at 50. Also introduced at trial was a copy of a work hardening evaluation stating that Bryson was " 'currently functioning at a LIGHT physical demand level' and that 'there does not appear to be any reason he should be unable to perform at somewhat higher levels if he were to increase his strength and endurance through a regular exercise program.' " *Id.* Also, on February 2, 1994, Bryson submitted a claim for short-term disability, in which he stated that he had " 'on going [sic] pain from the back surgery I had on July of 1992 [sic] and continuing to get worst [sic].' " *Id.* The Fund conceded on appeal that prior to Bryson's second injury, Vickers had been provided with written records showing that Bryson had a preexisting condition.

The Fund argued that the aforementioned documents did not satisfy the statute because they did not inform Vickers of the

precise extent of Bryson's preexisting condition. After noting that the Nebraska Workers' Compensation Act is to be liberally construed, we held that the records provided to Vickers put it on sufficient notice that Bryson had an abnormal, permanent condition that was likely to be a hindrance in his employment. We quoted 5 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law § 59.33(c) at 10-501 through 10-509 (1998), which states:

> It is clear that the employer does not have to know exactly what the employee's prior condition is in medical terms. . . .
>
> . . . .
>
> Since the second injury principle applies only to preexisting permanent conditions, the employer would have to know, not just that the employee had some abnormal condition, but that the condition was *permanent* in character.

(Emphasis supplied.)

In the instant case, Treantos, United-A.G.'s director of insurance, testified that exhibit 26 was a personnel file which combined Baughman's attendance records and workers' compensation records. With respect to this exhibit, Treantos was asked, "Can you show me, sir, on any of those documents, where it indicates permanent impairment ratings?" Treantos answered, "It doesn't indicate permanent ratings on these documents." Further testimony established that exhibit 26 did not state permanent impairment ratings.

No part of exhibit 26 demonstrates that Baughman's condition was one which *was permanent in character*. Page one of exhibit 26 is an attendance record which reveals that Baughman received *temporary* total disability payments from United-A.G.'s workers' compensation insurer. Pages two through four are progress notes from the Methodist WorkAbility Center regarding Baughman's physical therapy. There is no indication in these notes that Baughman's injuries are permanent. Page five is a "Statement of Disability" signed by Dr. Long which releases Baughman to work "without restrictions, full capacity," but assigns no permanency rating. Page six of exhibit 26 is an "Employment Confirmation Letter" which states that Baughman is allowed to work without restrictions. Page seven

is another "Statement of Disability" from Dr. Long which notes that Baughman will be released to work at "full capacity, without restrictions, see below." "See below" references the notation "little or no roller stops for 6 months; power jack when needed." Page eight, another employment confirmation letter, merely repeats the information found on page seven. The balance of exhibit 26 is titled "Job Analysis" and has no indication that Baughman's injuries are permanent. United-A.G. does not contend that there is any other document in evidence, besides exhibit 26, from which the written records requirement could be satisfied. After our examination of the record, we also conclude that the only possible evidence of United-A.G.'s actual knowledge of Baughman's disability, *as established by proper written records*, must come from exhibit 26.

While exhibit 26, when viewed most favorably to Baughman (and United-A.G.), allows the conclusion that Baughman had two prior back injuries of some consequence which required treatment and caused him to miss time from work, the exhibit is devoid of any opinion by anyone that he was left with a permanent disability or impairment. We recognize that those with experience in this area, i.e., compensation court judges, claims managers, and employment managers, may well feel that some degree of permanent disability inevitably results when a worker sustains a back injury requiring surgical intervention. Such a conclusion is somewhere on a continuum between outright speculation and reasonable inference, depending on the quality of the information in the employee's record, for example, a precise diagnosis and the exact nature of the surgery, none of which are found in exhibit 26. But, such speculation or inference is not actual knowledge by the employer of a permanent disability, established by written records, which is what the plain language of the statute requires. To reach the opposite conclusion would require a very liberal interpretation of the evidence. However, the rule of liberal construction of the Nebraska Workers' Compensation Act applies to the law but not to the evidence offered in support of a claim for benefits under the act. *Smith v. Ruan Transport, Inc.*, 190 Neb. 509, 209 N.W.2d 146 (1973). Moreover, we are unwilling to extend the *Akins v. Happy Hour, Inc.*, 209 Neb. 236, 306 N.W.2d 914 (1981),

exception to back injuries. Knowledge of a prior back injury does not inevitably mean that the employer has actual knowledge of a permanent disability as is true when the worker applies for work with an amputated hand, arm, or leg. Because exhibit 26 fails to "establish by written records that the employer had knowledge of the preexisting *permanent* partial disability" (emphasis supplied), § 48-128(1)(b), it was clearly wrong for the Workers' Compensation Court to find that the written records requirement had been satisfied, unless the information in the possession of the insurer can be imputed to the employer.

Baughman argues that "the employer, individually and through its insurer, did have precise knowledge of the plaintiff's pre-existing condition and this is established in the medical records received into evidence in Exhibits 8 and 9 submitted by the plaintiff." Brief for appellee Baughman at 14. However, under the controlling statute, the issue is not whether somebody at United-A.G. had actual knowledge of Baughman's preexisting permanent condition, but whether United-A.G. had written records establishing this knowledge.

Exhibits 8 and 9 were in the possession of United-A.G.'s workers' compensation insurer, and they say that Dr. Long was of the opinion that Baughman had a permanent impairment rating of 10 percent of the whole body after his first surgery and an additional 2-percent permanent impairment after his second surgery. However, to the extent that United-A.G. had knowledge of these permanency ratings from exhibits 8 and 9, it came only by oral communications between Reese, claims adjuster for the insurer, and Treantos, United-A.G.'s insurance director. During the direct examination of Treantos, he testified:

> A. Well, my recollection as to actually getting a physical copy of the report [on Baughman's disability rating], I'm not real clear on that. What I am clear on is that we discussed the case and we discussed the rating and we discussed the report.
>
> Q. And that was at the time the rating was issued?
>
> A. Right. One of the things that happened right around this time was the issue of medical records and privacy rules and this kind of thing, so we used to have a lot of data on our employees and their medical conditions. But

as time went on and the rules changed, we left a lot of data — really, we let it stay at the insurance carrier's offices and in their files.

Q. And having had those discussions with Ms. Reese, did you feel that you needed a hard copy of that report?

A. No.

Baughman appears to be arguing that because the workers' compensation insurer could establish its knowledge by written records that Baughman had a permanent preexisting injury, such knowledge should be imputed to the employer, United-A.G. Baughman's end result would be that United-A.G. would then be found to have established that it had knowledge of Baughman's preexisting permanent disability via written records, albeit written records in the possession of United-A.G.'s insurance carrier.

The Supreme Court of Alaska addressed a similar argument in *Alaska Intern. v. Second Injury Fund*, 755 P.2d 1090, 1091 n.1 (Alaska 1988), which involved the interpretation of Alaska's Second Injury Fund statute, "AS 23.30.205(c)," which provided:

"In order to qualify under this section for reimbursement from the second injury fund, the employer must establish by written records that the employer had knowledge of the permanent physical impairment before the subsequent injury and that the employee was hired or retained in employment after the employer acquired that knowledge."

(Emphasis omitted.) The pertinent portions of the Alaska statute are identical to our § 48-128.

The facts in *Alaska Intern.* were that on February 9, 1983, Oscar Kinter injured his back while working for Alaska International. The Alaska Workers' Compensation Board (Board) ruled that Kinter was permanently totally disabled as a result of his back condition and that Alaska International had been paying him workers' compensation disability payments since the February 9 injury. Prior to this injury, Kinter had a history of back trouble. His first work injury occurred in 1975, with repeated injuries in 1976 and 1978. He had undergone two back surgeries: one in 1975 and one in 1979. Following the second surgery, Kinter's doctor estimated that he had a 40-percent partial impairment.

Kinter had been dispatched by his union to a welding job with Alaska International. The union had a contract with Alaska International whereby the union agreed to furnish all the qualified workers which Alaska International might require, and Alaska International agreed to exclusively use the services of the union's hiring hall. The union maintained certain records of its members. On the date it dispatched Kinter to the welding job, the union had in its possession a memo, dated June 19, 1980, stating that Kinter had fallen out of a truck while unloading iron and had injured his back. This document was, at all relevant times, in the union's possession.

Following Kinter's February 9 injury, Alaska International filed a petition for reimbursement from the Second Injury Fund. The fund administrator denied relief, and Alaska International petitioned the Board, which also denied relief based upon the written records requirement. The Board strictly construed AS 23.30.205(c) and ruled that the union records failed to show " 'knowledge of a qualifying permanent physical impairment.' " *Alaska Intern.*, 755 P.2d at 1092.

The issue on appeal was to be whether Alaska International had established its knowledge of Kinter's preexisting impairment by written records. But, before addressing this issue, the Supreme Court of Alaska stated: "However, the preliminary question is whether the union record can be considered at all. That record was in the union's, not Alaska International's, possession, and Alaska International does not claim to have ever seen the record before Kinter's injury." *Id.* It was argued that the union's *knowledge* of Kinter's qualifying disability, as evidenced by its written records, should be imputed to Alaska International for purposes of determining whether the employer had met the statutory requirements.

The Supreme Court of Alaska, in determining that the union records should not be imputed to Alaska International, stated:

A union's primary purpose is to organize and secure for its members the most favorable conditions with respect to wages, hours, and other employment concerns. . . . "Generally, a union represents only its members and not their employer. . . ." A labor union's purpose is to further the interests of employees, not the interests of employers.

*Alaska Intern. v. Second Injury Fund*, 755 P.2d 1090, 1093 (Alaska 1988).

The court recognized that since a union's purpose is to obtain jobs for its members, it does not have the disincentive to hiring impaired workers that the Second Injury Fund statute tries to counteract. The Alaska court concluded: "Thus, if the union's knowledge, as evidenced by its written records, is attributed to the employer, the [written records] statute's purposes will be frustrated." *Id.* We agree. The purpose of the Fund is to assure employers that if they hire or retain individuals with preexisting disabilities, those employers will be liable only for those injuries which would have resulted had there been no preexisting disability. *Parker v. St. Elizabeth Comm. Health Ctr.*, 226 Neb. 526, 412 N.W.2d 469 (1987).

The purpose of the written records requirement is quite clearly to put in place a strictly limited method of proving a predicate fact before liability for benefits may be shifted to the Fund. We remember that the Second Injury Fund statute merely provides a means to shift and apportion benefits between the employer and the Fund, which inures to the benefit of the employer. See *Eichorn v. Eichorn Trucking*, 3 Neb. App. 795, 532 N.W.2d 345 (1995). The purpose of the Second Injury Fund statute is to encourage employers to hire those with permanent preexisting disabilities. See *Lozier Corp. v. State*, 1 Neb. App. 567, 501 N.W.2d 313 (1993). Therefore, an insurer is like the union in *Alaska Intern., supra*—neither entity is a "hirer" of workers (except its own employees) and thus what it knows about an employer's potential employee and his or her previous back injuries is not part of the equation as to whether the worker is hired or retained. Neither the union nor the insurance carrier makes that decision. The statute gives employers an incentive to hire the permanently disabled, but restricts the benefits from that action to those employers who do so with knowledge that they are doing a socially desirable thing. In other words, the hiring of the permanently disabled is to be a very purposeful thing before the employer gets the benefit of shifting liability. The purposefulness is insured, at least in theory, by the written records requirement. To impute knowledge where it did not actually exist would frustrate the policy that the benefit of the

Fund (the shifting of liability for benefits for a subsequent injury) goes only to those employers who consciously hire those they know to be suffering from prior permanent disabilities. Allowing the imputation of knowledge would completely frustrate that policy.

However, a separate issue is presented in that the statute requires that the employer can only prove that it had the knowledge by written records. The instant case may well show that limiting proof of knowledge to written records is arbitrary. Clearly, United-A.G. was aware of Baughman's previous injuries and extensive time off for surgery, yet they did what the Legislature has determined they should do—retained in their employment a person with significant previous injury, which was likely to produce a permanent disability, in their employment. Therefore, by virtually any measure of what is right and fair, United-A.G. should receive the benefit of the Second Injury Fund statute. But, the Legislature has mandated that the employer's knowledge be proved in a certain way, and we are not free to ignore that mandate for the sake of accomplishing what may well be a fair result. Whether the benefits of the Fund should be denied employers who do the right thing by employing the permanently disabled, but who do not secure and keep the right pieces of paper in their employee files, is a matter of public policy which is outside our realm.

## CONCLUSION

■ Written records that were in the workers' compensation insurer's possession cannot be "imputed" to United-A.G. for purposes of enabling it to meet the requirement of § 48-128(1)(b). Further, exhibit 26 is insufficient to prove that United-A.G. had knowledge of the permanency of Baughman's condition, a requirement under the same section. The trial judge was clearly wrong in finding otherwise. Thus, we reverse the decision of the review panel affirming the Workers' Compensation Court's decision to hold the Fund liable and direct that the award be modified to make United-A.G. solely liable for Baughman's benefits.

REVERSED AND REMANDED WITH DIRECTIONS.