VECO ALASKA, INC. and Alaska National Insurance Company, Appellants,

v.

STATE of Alaska, DEPARTMENT OF LABOR, DIVISION OF WORKERS' COMPENSATION, SECOND INJURY FUND, Appellee.

No. S–12163.

Supreme Court of Alaska.

July 25, 2008.

Allan E. Tesche and Karen Russell, Russell, Tesche, Wagg, Cooper & Gabbert, P.C., Anchorage, for Appellants.

Richard W. Postma, Jr., Assistant Attorney General, Anchorage, and David W. Márquez, Attorney General, Juneau, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, and CARPENETI, Justices.

*OPINION*

FABE, Chief Justice.

## I. INTRODUCTION

Cornelius "Buck" Huizenga worked at VECO for approximately eleven years in a number of positions. Before beginning his VECO employment, he sustained a back injury while working for another employer. He reinjured his back at his VECO job while moving some timbers. He then had three surgeries and ultimately was confined to a wheelchair. VECO paid his workers' compensation benefits and petitioned the Second Injury Fund for partial reimbursement. The Fund denied both that Huizenga had a qualifying preexisting condition and that VECO had established by a written record that it knew Huizenga had such a preexisting condition. The Alaska Workers' Compensation Board found that VECO had not produced written records from which it could reasonably be inferred that VECO had prior knowledge of Huizenga's qualifying impairment. Because the Board applied a standard that was too restrictive in evaluating whether VECO satisfied the written record requirement, we reverse the Board's decision denying VECO's petition and remand the case to the Board for further proceedings.

## II. FACTS AND PROCEEDINGS

Cornelius Huizenga has a congenital condition diagnosed as achondroplastic dwarfism. The condition is characterized by defects in bone formation and results in short stature. Another consequence of Huizenga's achondroplasia is his narrow spinal canal, which means that arthritic changes occur in him at a relatively early age.

In December 1988 Huizenga was working for a private contractor when he fell from a stepladder, landing on his back and left hip area. He was diagnosed with "lumbar spinal stenosis—diastematomyelia with bilateral radiculopathy."[1] As a result of this injury, he had L3, L4, and L5 laminectomies and bilateral neural foraminotomies at the S1, L5, and L4 nerve roots in January 1989.[2] Huizenga received a twenty-two percent permanent partial impairment rating due to this injury.

Huizenga began working for VECO the summer following this back surgery. He worked for VECO at different locations over the next several years. On April 30, 1996, and again on October 1, 1997, Huizenga completed health questionnaires for VECO. His answers to both health questionnaires disclosed that he had a prior back injury and surgery, that he had never been advised to limit his activities in any way, and that he did not have arthritis. His response to the second questionnaire provided the following details about his back surgery: "Back operation, compression 5 lower vertebrae, Dec[.] 21, 1987, Dr. Voke."[3]

In January 1999 Huizenga began work for VECO as an equipment operator at the Port of Anchorage. On October 15, 2000, he reinjured his back at work.[4] He was dragging several timbers that weighed about thirty pounds each when "something let go" in his back, and he began to experience pain. At first Huizenga simply took over-the-counter pain medication. But about a week following the accident, he was hospitalized because he could not move his legs. On October 24, 2000, Huizenga again had back surgery to relieve pressure on his nerves. This time the sur-

---

1. Spinal stenosis is a narrowing of the spaces in the spine; stenosis is linked to arthritis. Diastematomyelia is a congenital anomaly in which the spinal cord is split into halves by a bony body or fibrous band. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 461 (28th ed.1994). Radiculopathy is a disease of the nerve roots. *Id.* at 1404.

2. A laminectomy is the excision of the posterior arch of a vertebra. *Id.* at 898. A foraminotomy is an operation for removing the roof of the intervertebral foramina, done for the relief of nerve root compression. *Id.* at 650–51. The foramina are the holes where the nerves exit the spinal column as they extend into the extremities.

3. Huizenga gave the wrong date for his surgery.

4. VECO uses October 17, 2000 for the date of injury. The Board used October 15, 2000 in its decision.

gery involved laminectomies of T12, L1, L2, and L3, as well as a partial L4 laminectomy, decompression of conus cauda equina, and foraminotomies at L1–2, L2–3, and T12–L1.[5] He was discharged from the hospital about four weeks later in a wheelchair after having spent several weeks in rehabilitation therapy.

Huizenga remained unable to walk, and on March 11, 2002, he underwent a spine fusion surgery in Colorado. He developed complications and was readmitted to the hospital for a fourth surgical procedure in late March 2002.

On June 24, 2003, Dr. Susan Klimow gave Huizenga a permanent partial impairment rating. Huizenga was then in a wheelchair and could stand only by using a walker. Dr. Klimow indicated that she had to take into account Huizenga's prior twenty-two percent permanent partial impairment rating in determining his whole person impairment. She stated, "His new whole person impairment rating is 57%."

Dr. Edward Voke, Huizenga's orthopedic surgeon in Anchorage, stated in an affidavit submitted to the Alaska Workers' Compensation Board that the combined effects of Huizenga's 2000 injury and his preexisting arthritis produced a disability that was substantially greater than the injury that would have resulted from the 2000 injury alone. Dr. Klimow later signed an affidavit concurring with this assessment.

On May 11, 2004, VECO filed a "Petition to Join Second Injury Fund and Claim for Reimbursement" with the Board.[6] VECO alleged that it had met the statutory requirements for reimbursement. Nichola Lienhart, an employee in VECO's risk management department, filed an affidavit averring that VECO had written knowledge that Huizenga had arthritis before his October 2000 injury. In support, she attached Huizenga's two completed health questionnaires. As additional support, VECO submitted Dr. Voke's affidavit, in which Dr. Voke stated that Huizenga's answers to the October 1, 1997 health questionnaire "would have alerted a reasonable employer to the presence of arthritis in his lower spine on October 1, 1997 because that condition is closely related to his post-operative condition ten years earlier."

The Second Injury Fund, through its administrator, filed an answer that disputed whether VECO had established by written record knowledge of a qualifying preexisting condition and whether Huizenga in fact had a qualifying preexisting condition.

On August 19, 2004, Dr. Klimow signed an affidavit stating that the information Huizenga provided on his October 1, 1997 health questionnaire would have alerted a reasonable employer to arthritis in Huizenga's lower spine. Dr. Voke and Dr. Klimow both testified via deposition at the hearing on VECO's petition to join the Second Injury Fund. Before the hearing Huizenga stated in an affidavit that he did not know he had arthritis before the litigation regarding the Second Injury Fund.

The Board held a hearing on VECO's petition on January 6, 2005. The only witness to testify in person at the hearing was Huizenga, who again affirmed that he did not know that he had arthritis when he answered the 1996 and 1997 health questionnaires. The sole issue before the Board was, as the Board saw it, whether VECO's prior knowledge of Huizenga's arthritis could fairly and reasonably be inferred from the written records VECO had produced.[7]

The Board decided that Huizenga's answers to VECO's health questionnaires were not a written record from which prior knowledge of Huizenga's arthritis could fairly and reasonably be inferred. In so deciding, the

5. The conus medullaris is the cone-shaped lower end of the spinal cord at the level of the upper lumbar vertebrae. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 374 (28th ed.1994). The cauda equina is the collection of spinal roots that descend from the lower part of the spinal cord and occupy the vertebral canal below the cord. *Id.* at 280.

6. The Second Injury Fund partially reimburses employers for some workers' compensation ben-

efits when they meet statutory requirements. AS 23.30.205.

7. VECO asserted at the hearing that the Second Injury Fund no longer contested that Huizenga in fact had a qualifying physical impairment. The Board decision states that it does not address the other issues raised in the Second Injury Fund's answer.

Board found that Huizenga had not been told until September 2004 that he had arthritis. It concluded that Huizenga's disclosure that he had a prior back injury and surgery was an insufficient written record, as a matter of law, to establish that VECO knew about Huizenga's arthritis. The Board also found that the two doctors who testified for VECO had reached their conclusions based on their knowledge of Huizenga's medical records, not his health questionnaires; it further determined that VECO had not shown by a preponderance of the evidence that it had knowledge of a qualifying preexisting condition.

VECO appealed to the superior court, arguing that the Board erred as a matter of law in reaching its ultimate conclusion; after independently reviewing the evidence, the superior court affirmed the Board's ruling.

VECO appeals.

## III. DISCUSSION

### A. Standard of Review

■■■ When the superior court acts as an intermediate court of appeals in a workers' compensation case, we directly review the Board's ruling.[8] Whether VECO established by a written record its knowledge of Huizenga's preexisting impairment turns on a question of statutory interpretation involving no agency expertise.[9] We review issues of statutory interpretation under the independent judgment standard, "adopting 'the rule of law that is most persuasive in light of precedent, reason, and policy.' "[10]

■■■ The dissent argues that the proper standard of review for this case is the substantial evidence test. If we were reviewing only the Board's factual determinations, this might be the correct standard of review.

But we are reviewing the legal standard the Board used here to evaluate the evidence, not simply its determinations of weight or other factual findings. Also, the Board decided as a matter of law the record was insufficient.

### B. The Board Applied a Standard that Was Too Restrictive.

#### 1. The Second Injury Fund

■■■ The Second Injury Fund "was created to encourage employers to hire and retain partially disabled employees."[11] The Second Injury Fund reimburses qualifying employers for workers' compensation benefits paid to disabled employees after 104 weeks if an employee's preexisting permanent physical impairment, combined with his subsequent injury, "results in compensation liability substantially greater than [what] would have resulted had the preexisting condition not existed."[12] To be eligible for reimbursement from the Fund, the employer is required to establish by written records that it had knowledge of the employee's permanent physical impairment before the subsequent injury occurred and that it retained the employee after it acquired that knowledge.[13] The Alaska Workers' Compensation Act contains a list of conditions that are presumptively disabling, as well as a provision that covers conditions that are not listed.[14] Although the employer's written record need not contain the exact medical terminology of the statute, it must contain adequate information to support a reasonable inference that the employee suffered from a qualifying impairment.[15]

■■■ Not all causes of permanent physical impairment qualify for reimbursement from

8. *Alyeska Pipeline Serv. Co. v. DeShong*, 77 P.3d 1227, 1231 (Alaska 2003).

9. *Sea–Land Servs., Inc. v. State, Second Injury Fund*, 737 P.2d 793, 795 (Alaska 1987); *see also Alaska Int'l Constructors v. State, Second Injury Fund*, 755 P.2d 1090, 1091 (Alaska 1988).

10. *Bloom v. Tekton, Inc.*, 5 P.3d 235, 237 (Alaska 2000) (quoting *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

11. *Sea–Land Servs., Inc.*, 737 P.2d at 795 (citing *Employers Commercial Union Ins. Group v. Christ*, 513 P.2d 1090, 1093 (Alaska 1973)).

12. *Alaska Int'l Constructors*, 755 P.2d at 1092.

13. AS 23.30.205(c).

14. AS 23.30.205(d).

15. *Sea–Land Servs., Inc.*, 737 P.2d at 795.

the Second Injury Fund. To be considered a permanent physical impairment for Second Injury Fund purposes, the condition must be listed in the statute or fall within the statute's general provision.[16] An employer need not show that a listed condition is in fact a hindrance to employment for a specific employee; if the condition is one covered by the Second Injury Fund statute, a permanent physical impairment exists as a matter of law.[17] Permanent impairment for purposes of Second Injury Fund reimbursement is different from permanent impairment for receipt of permanent partial impairment benefits.[18] A qualifying condition for Second Injury Fund purposes need not be work related; in fact, some qualifying Second Injury Fund conditions are congenital, such as muscular dystrophies.[19] VECO does not allege that Huizenga had any condition other than arthritis that might qualify as a physical impairment for purposes of Second Injury Fund reimbursement.[20]

### 2. The written record requirement

In *Sea–Land Services, Inc. v. State, Second Injury Fund,* we construed the written record requirement as follows: "[A]n employer is entitled to reimbursement from the Second Injury Fund if it produces a written record from which its prior knowledge of the employee's qualifying disability can fairly and reasonably be inferred."[21] We identified two purposes for the written record requirement: (1) it protects the Fund against spurious or collusive claims by demonstrating that the employer actually knew of the preexisting condition, and (2) it eliminates the need to litigate whether the employer had knowledge of the preexisting condition.[22]

The issue presented in this appeal is whether VECO's knowledge that Huizenga has a permanent impairment as defined in AS 23.30.205 can fairly and reasonably be inferred from the written record VECO presented to the Second Injury Fund and the Board. The Board held that it could not, based in part on its interpretation of our prior cases. VECO urges us to overturn the Board's findings and conclusions of law, arguing that the Board applied an incorrect standard and misconstrued the evidence. The State asks us to affirm the Board, asserting that the Board's decision is legally correct and supported by substantial evidence.

■ The Board construed our prior cases and the relevant statute as requiring VECO to show not only that his employer knew that Huizenga suffered from a permanent physical impairment, but also had knowledge of the *specific* physical impairment he suffered from, i.e., arthritis. Thus, the Board found that "the employer's written record that the employee had prior back injuries and surgeries, and nothing more, does not reasonably connote a preexisting arthritic condition and therefore is insufficient as a matter of law to establish the employer's written notice of a preexisting qualifying disability." It also stated that Huizenga's denial that he had arthritis and his description of his back surgery "negate[d] any argument" by VECO that it had written notice of an arthritic condition. This goes beyond what we have previously held an employer must show to obtain reimbursement from the Second Injury Fund and what we believe the correct standard is.

By requiring VECO to present evidence that showed unequivocally that VECO knew Huizenga had arthritis rather than simply a permanent impairment, the board imposed a requirement that exceeds what we have previously held an employer must show to obtain reimbursement from the Second Injury Fund.[23] This strict standard is one that

---

16. AS 23.30.205(d).

17. *Christ,* 513 P.2d at 1093–94.

18. *Compare* AS 23.30.190(b) *with* AS 23.30.205(d).

19. AS 23.30.205(d).

20. As previously noted, Huizenga has achondroplasia. At oral argument before us, VECO stated

that Huizenga's achondroplasia is legally irrelevant to its Second Injury Fund claim.

21. *Sea–Land Servs., Inc.,* 737 P.2d at 795.

22. *Id.*

23. *Id.* (holding that "[t]he written record need not contain the exact medical terminology").

most employers would likely not be able to meet based on information from employee-based questionnaires. Employees may not fully understand their medical conditions or may misconstrue a doctor's advice or opinions. Here, for example, Huizenga denied that he knew he had arthritis before the Second Injury Fund litigation, even though the doctors who treated him testified that his medical records indicated the presence of an arthritic condition. As Huizenga told the Board, "I'm just not a doctor-type person. I just don't know what these terms mean, you know, like the arthritis." We are concerned that the standard the Board used here creates the wrong incentive for employers: it could discourage employment or retention of any employee who appears to have an impairment unless the impairment can easily and explicitly be pinned to a specific cause listed in AS 23.30.205(d)(1). Because one of the purposes of the Second Injury Fund is to encourage employment and retention of employees with physical impairments,[24] the stringent standard used by the Board is contrary to the purpose of the Fund.

█ VECO argues that the written record requirement is met when there is enough evidence in the written record "to tempt the employer to discriminate against an employee on the basis of a qualifying condition under AS 23.30.205(d)." In looking at what the employer needs to show to qualify for Second Injury Fund reimbursement, we previously held that the written record does not need to contain the exact medical terminology describing the condition.[25] As Larson notes in his treatise:

It is clear that the employer does not have to know exactly what the employee's prior condition is in medical terms. If the employer, who was the claimant's mother, knew that something was troubling the employee about his bones, she did not need to know also that it was Paget's disease. And if the employer, a brewmaster, knew of the permanency of claimant's previous shoulder injury, but did not know "what the trouble was," the employer had sufficient prior knowledge.[26]

█ The written record requirement does not dispense with an employer knowledge requirement, as the dissent suggests.[27] One purpose of the written record standard—providing evidence of employer knowledge[28]—addresses the problems of litigation time and cost that Larson identifies with an actual knowledge standard,[29] but it does not waive employer knowledge.

█ As we noted above, the underlying purpose of the Second Injury Fund is to encourage employers to hire workers who are known to suffer from a permanent physical impairment.[30] In order to prevent employers from claiming knowledge of a permanent physical impairment opportunistically after a subsequent injury, the legislature imposed a written record requirement.[31] This purpose is satisfied if the employer's written record shows a preexisting permanent impairment that could reasonably be due to one of the conditions listed in AS 23.30.205(d)(1), even if the employer cannot precisely identify the specific medical condition. In other words, if the written record shows that an employee had a permanent or chronic condi-

---

24. *Christ*, 513 P.2d at 1093.

25. *Sea–Land Servs., Inc.*, 737 P.2d at 795.

26. 5 ARTHUR LARSON & LEX K. LARSON, LARSON'S WORKERS' COMPENSATION LAW § 91.03[3] (2000) (citations omitted). Notwithstanding the views of the dissent, Larson's discussion of the level of knowledge that an employer must have logically applies both to jurisdictions where knowledge may be established by any form of proof and to jurisdictions, such as Alaska, where knowledge may be established only by written records. *See Sea–Land Servs., Inc.*, 737 P.2d at 795 (stating that written record requirement provides evidence that employer actually knew of preexisting impairment).

27. AS 23.30.205(c).

28. *Sea–Land Servs., Inc.*, 737 P.2d at 795.

29. LARSON & LARSON, *supra* note 26 at § 91.03[5]. According to Larson, a written record standard is a way "to cut down on controversy about employer knowledge." *Id.* at § 91.03[6].

30. *Christ*, 513 P.2d at 1093.

31. *Sea–Land Servs., Inc.*, 737 P.2d at 795 (citing *U.S. Pipe & Foundry Co. v. Caraway*, 546 S.W.2d 215, 219 (Tenn.1977)).

tion that could be a hindrance to employment, the written record requirement would be satisfied. This construction of the written record requirement is substantially the same as the Arizona appellate court's construction of a similar statute.[32] If an employee disclosed that she had "knee problems" and had undergone knee surgery and a laminectomy, the written record would be satisfied, even though the employer did not know the specific reason for the laminectomy or knee problems.[33] Or if an employee takes sick leave over the years for back problems and this is recorded in the employer's files, the employer shows that it had knowledge of the impairment, even if the employer does not know that the employee had degenerative disk disease.[34] If an injury happens after the employer acquires knowledge of the permanent condition, the Second Injury Fund should reimburse the employer so long as the underlying impairment is in fact one of the conditions listed in the statute and the other statutory requirements are met.[35]

■ Although the dissent cautions that the term "back problems" lacks precision, this is the type of information that an employee is likely to give to his employer. We specifically held in *Sea–Land Services* that the written record did not need to use exact medical terminology.[36] If an employer is aware of an employee's medical problems and records them in everyday language, that

employer still satisfies the written record requirement.[37]

■ The dissent may misunderstand our statement that the purpose of the written record requirement is satisfied when the record shows an impairment that could reasonably be due to a condition listed in the statute. Reasonableness in construing the employer's written record is required by the test in *Sea–Land Services* and is not a foreign notion in determining the meaning of a written record.[38] The written record need not show that an underlying cause of the impairment was, in fact, a condition listed in AS 23.30.205. Whether such a causal relationship existed may be demonstrated at the hearing by any acceptable evidence. Further, our statement is not concerned with a causal relationship between the preexisting condition and the subsequent injury[39] but is meant to clarify the standard an employer must meet to qualify for Second Injury Fund reimbursement.

Because the health questionnaires are the only written records that VECO alleges it had before the October 2000 injury, the question whether VECO's knowledge of a permanent impairment satisfies the written record requirement turns on what conclusions can be drawn from those health questionnaires.[40] Because the Board is charged with evaluating evidence in compensation proceedings,[41] we must remand the case to the Board. Although Huizenga told VECO that he had

---

**32.** *Special Fund Div. v. Indus. Comm'n of Ariz.,* 182 Ariz. 341, 897 P.2d 643, 649 (App.1994); *Country Wide Truck Serv. v. Indus. Comm'n of Ariz.,* 181 Ariz. 410, 891 P.2d 877, 879 (App. 1994).

**33.** *Special Fund Div.,* 897 P.2d at 649.

**34.** *Denton v. Sunflower Elec. Coop.,* 12 Kan. App.2d 262, 740 P.2d 98, 103 (1987); *see also Country Wide Truck Serv.,* 891 P.2d at 879 (holding that written record showing that claimant had lumbar laminectomy and posterior cervical fusion sufficient to show employer knew of employee's preexisting disabling condition).

**35.** AS 23.30.205.

**36.** *Sea–Land Servs.,* 737 P.2d at 795.

**37.** *See Christ,* 513 P.2d at 1092 (holding that written record requirement met by notation on

personnel evaluation that employee's loss of arm did not slow his work).

**38.** *Sea–Land Servs.,* 737 P.2d at 795 (holding that written record requirement satisfied if prior knowledge of disability can be inferred fairly and reasonably).

**39.** The qualifying condition does not need to cause the new injury. The qualifying condition, in combination with the subsequent injury, need only produce a disability that is greater than what would have resulted from the subsequent injury alone. AS 23.30.205(a).

**40.** Huizenga's medical records indicate that he was diagnosed with arthritis before October 2000, but nothing in the appellate record suggests that VECO had those medical records at or before the time of Huizenga's injury.

**41.** AS 23.30.122.

back surgery involving "compression" and "[five] lower vertebrae," he also checked the box on the questionnaire showing that he had never been advised by a health care provider to limit his activities in any way. The Board will need to decide in the first instance whether the written record VECO relied on, showing that Huizenga had a prior back injury and surgery, supports a fair and reasonable inference that Huizenga had a preexisting back condition that was a permanent physical impairment. If the Board determines that such an inference can be made, then the written record requirement should be considered met, and the Board can determine whether VECO has satisfied the other statutory requirements for Second Injury Fund reimbursement.

▮ What the employee or his doctors understood the questionnaire to mean is evidence that the Board may choose to consider, but the statutory standard is the employer's knowledge, not the knowledge of either the employee or his physicians.[42] The Board may choose here to weigh the testimony of Drs. Klimow and Voke in determining what inferences an employer could reasonably draw from the answers to the health questionnaire, but expert testimony is not necessary to demonstrate what a reasonable inference might be. Unless VECO can demonstrate that it had Huizenga's medical records in its possession at some time prior to the 2000 injury, the contents of the medical records discussed by the doctors in their depositions cannot serve as a written record showing VECO's pre-injury knowledge.

We disagree with the State's argument that our previous cases interpreting the written record requirement compel the result that the Board reached. Both cases are consistent with our holding today. In *Sea–Land Services, Inc. v. State, Second Injury Fund*, the only record was a physical examination report.[43] The report contained a box marked "yes" next to "head or spinal injuries" but no other information about the nature and extent of the injuries.[44] The report also indicated that the employee had no "[p]ermanent defect from illness, disease, or injury" and that his spine was "OK." [45] The parties agreed that the employer had actual knowledge of the employee's previous back surgery for a herniated disk.[46] We concluded that it could not reasonably be inferred from the written record that Sea–Land knew of the employee's permanent disability.[47] In *Sea–Land Services*, the written record contained no reference to surgery or to anything else that might indicate that the employee's previous injury had caused lasting damage.

In *Alaska International Constructors v. State, Second Injury Fund*, the employer had slightly more information.[48] Alaska International had a resume from the employee stating that he had been injured by a sheet of iron while working for a previous employer, that the injury had been corrected by surgery, and that he was released with no restrictions by his doctor to return to work.[49] Besides the resume in the employer's possession, the employee's union had a written record showing that the employee had suffered a back injury and had undergone three back surgeries.[50] In *Alaska International*, even though the union record did not mention arthritis, the State conceded that if the union records were imputed to the employer, the written record requirement would be satisfied.[51] We determined that the union record could not be imputed to the employer.[52] Although our opinion stated that the resume's reference to an injury failed to raise the inference that Alaska International knew of the employee's arthritis—and in this respect went too far—the focus of the inquiry

---

42.  AS 23.30.205(c).

43.  737 P.2d at 795.

44.  *Id.* at 795–96.

45.  *Id.* at 796.

46.  *Id.* at 794.

47.  *Id.* at 796.

48.  755 P.2d 1090, 1091–92 (Alaska 1988).

49.  *Id.*

50.  *Id.* at 1091.

51.  *Id.* at 1092 n. 6.

52.  *Id.* at 1093.

did not need to be on the precise medical condition.[53] The resume's reference to an injury did not even identify the body part that had been injured and did not in any way indicate that the employee might have suffered a permanent impairment because of the injury.[54] The resume failed to raise an inference that the employer knew of *any* condition, not just arthritis, that might have caused the employee to have a permanent impairment. We noted, "The reference to [the employee's] injury could reflect any injury which is sufficiently severe to require surgery. One can not infer, without further information, that there will be a permanent impairment."[55]

In Huizenga's case, the employer had more information than the employers in either of our previous written record cases. Here, Huizenga told VECO that he had a back injury that required surgery and that it involved "compression" and the five lower vertebrae. The Board must determine whether VECO's knowledge that Huizenga had a permanent physical impairment can fairly and reasonably be inferred from this information and his other statements in the health questionnaires.

## IV. CONCLUSION

For the reasons above, we REVERSE the decision of the superior court affirming the Board's decision and REMAND this case to the Board for further proceedings consistent with this opinion.

EASTAUGH, Justice, dissenting.

BRYNER, Justice, not participating.

EASTAUGH, Justice, dissenting.

This is what the board said in the critical passage of the dispositive portion of the deci-

sion denying VECO's Second Injury Fund claim:

> The Board finds that the employer's *written record* that the employee had prior back injuries and surgeries, and nothing more, *does not reasonably connote a preexisting arthritic condition* and therefore is insufficient as a matter of law to establish the employer's written notice of a pre-existing qualifying disability.

(Emphasis added.) The entire paragraph containing the dispositive portion of the board's decision is attached as Appendix A.

The board's assessment of the employer's written records is supported by substantial evidence—the records themselves. The board's decision is also consistent with the legal standard that controls Second Injury Fund claims. Because the board did not err, we should affirm.

Today's opinion instead reverses and remands. I think it does so erroneously. But whatever the ultimate result may be in this case, we should not adopt a new and unjustified test for determining whether AS 23.30.205(c) is satisfied. I therefore respectfully dissent.

My disagreement starts with the standard of review. The court's opinion regards the case as turning on a question of statutory interpretation, freeing this court to apply its independent judgment.[1]

But this case does not really turn on statutory interpretation. The critical question is whether the employer's prior knowledge of the employee's qualifying disability can be fairly and reasonably inferred from the employer's written records.[2] That is how we phrased the question in *Alaska International Constructors v. State, Second Injury Fund,*[3]

---

53. *Id.* at 1094.

54. *Id.*

55. *Id.*

1. Op. at 987.

2. That is the standard the board applied here. The board first correctly recognized that we have "instructed" the board "to only consider whether a fair and reasonable inference can be drawn, and thereby imparted to the employer, from the written records." The board then permissibly used an equivalent phrase in finding that the written record "does not reasonably connote" the qualifying condition of arthritis. Everyone recognizes that arthritis, one of the specific conditions listed in AS 23.30.205(d)(1), is the only qualifying condition relevant in this case.

3. "The only question, then, is whether Alaska International's prior knowledge of Kinter's qualifying disability can fairly and reasonably be inferred from his resume." *Alaska Int'l Construc-*

a comparable case. As so phrased, the question inherently asks the board to weigh the written records to determine what fair and reasonable inferences may be drawn from them. In theory, an employer's written records could be so self-explanatory and self-evident that they would compel the board to conclude that the employer's prior imputed knowledge of a qualifying disability either *must be*, or *may not be*, fairly and reasonably inferred. If the written records do not compel one of those legal conclusions, they necessarily raise a factual question to be decided by the board. We apply the substantial evidence test in reviewing the board's factual findings.[4] The board here found that the written record showing only the employee's prior back injuries and surgeries "does not reasonably connote" a preexisting arthritic condition. The board's decision is ultimately based on its factual assessment of the adequacy of VECO's written records. We should review that assessment under the substantial evidence standard of review.

The realities of this case confirm that the substantial evidence standard of review applies. The board was in the best position to evaluate VECO's records and determine whether they permitted an inference of arthritis. We have no superior information or training that allows us to make a finding the board did not, or to say that the board should have reached a different result. We certainly cannot say that the information in the

written records was so clear that the board erred in making its factual finding.[5]

Whether the board applied the correct standard in weighing the evidence theoretically presents a threshold legal question. I say "theoretically," because there is no plausible indication the board deviated from the dictates of the controlling statute or from what we have said about applying that statute. The board said two things potentially bearing on whether it was actually making a legal determination. First, it noted that the employee was not informed he had arthritis until "long after" he filled out VECO's questionnaires. The court reads this statement as reflecting the board's legal misunderstanding of what evidence is relevant.[6] But the board did not reason that Huizenga's ignorance foreclosed VECO's claim. After mentioning what Huizenga was told, the board looked at VECO's written records in deciding whether there was a "fair and reasonable inference" VECO knew of a permanent impairment.[7] Second, the board stated that the employer's record "is insufficient as a matter of law" to satisfy the statute. But that conclusion depended on the board's review of the records and its determination that they do not reasonably connote a qualifying condition.

The court's opinion reads the board's decision as "requiring VECO to present evidence that showed *unequivocally* that VECO knew Huizenga had arthritis rather than simply a permanent impairment...."[8] It is unclear

*tors v. State, Second Injury Fund*, 755 P.2d 1090, 1094 (Alaska 1988).

4. *Bloom v. Tekton, Inc.*, 5 P.3d 235, 237 (Alaska 2000) (citing *Bockness v. Brown Jug, Inc.*, 980 P.2d 462, 465 (Alaska 1999)); *see also Brown v. State Workers' Comp. Bd.*, 931 P.2d 421, 423 (Alaska 1997) ("[W]e review the Board's factual determination[s] ... according to the 'substantial evidence' test.").

5. Because the board must determine whether the employer's written records permit an imputation of pre-injury knowledge of the qualifying condition that is a cause of the present disability, it is significant that the records contained the employee's denial of having had or having been treated for arthritis. In *Sea–Land Services, Inc. v. State, Second Injury Fund*, we thought it significant that Sea–Land's knowledge of the employee's disability "cannot reasonably be inferred"

from a written record that negated any possible inference of the qualifying condition. *Sea–Land Servs., Inc. v. State, Second Injury Fund*, 737 P.2d 793, 796 (Alaska 1987).

6. Op. at 988–89.

7. An employee's ignorance of the qualifying condition cannot foreclose the employer's claim. But his ignorance remains relevant to whether the employer's written records permit a fair and reasonable inference of that condition. Evidence that an employee's own physicians have not told him he has a qualifying condition is probative in deciding whether the records can be fairly read to impute knowledge of the condition to the employer. The board's mention of Huizenga's ignorance therefore reveals no legal error that would justify independent review.

8. Op. at 988 (emphasis added).

what error the court perceives. If the quoted passage is raising a question about the standard of proof, the independent standard of review would apply to that legal issue. But, as the plain text of the board's dispositive paragraph reveals, the board did not apply the wrong—"unequivocal"—standard of proof. If the quoted passage is raising a question about whether the board misapplied the statutory standard, whether the board did so is indeed a legal question. But because I think the board applied the correct statutory standard, the ultimate question is whether substantial evidence supported the board's factual assessment of the written records.

My second disagreement with the court's opinion is more fundamental. The opinion departs from both the statutory standard and from the approach we have said we (and the board) should follow in deciding such disputes. The Alaska Legislature adopted a Second Injury Fund scheme with two requirements germane here: first, that the employer, before it hired or retained the employee, had knowledge (or, more accurately, imputed knowledge) of the employee's permanent physical impairment; second, that this knowledge be established by the employer's written records.[9] Whether the employer's records establish the employer's knowledge of the qualifying condition is normally

for the board to decide.[10] Whether the evidence is sufficient is peculiarly within the board's province.[11] In *Sea–Land Services, Inc. v. State, Second Injury Fund*, we approvingly quoted as follows from a Tennessee Supreme Court opinion that interpreted what we described as "a written record requirement substantially identical to AS 23.30.205(c)":

> when it can fairly and reasonably be inferred from such records as are produced in evidence that the employer did have knowledge of the physical handicap or impairment of the employee before occurrence of the injury which activates the Second Injury Fund claim, then the [statutory] requirements . . . are satisfied.[12]

We then adopted for Alaska the test announced by the Tennessee Supreme Court: "[A]n employer is entitled to reimbursement from the Second Injury Fund if it produces a written record from which its prior knowledge of the employee's qualifying disability can fairly and reasonably be inferred."[13] We also stated that the written record "need not contain the exact medical terminology employed in AS 23.30.205(d)(1)."[14]

Today's opinion seems to alter the longstanding test announced in *Sea–Land Services* and applied in *Alaska International*.[15] The opinion does so in apparent reliance on a passage the court quotes from the Larson

9. *See* AS 23.30.205(c); *see also Sea–Land Servs., Inc.*, 737 P.2d at 795.

10. *See* AS 23.30.110(a) ("[A] claim for compensation may be filed with the board in accordance with its regulations . . . and the board may hear and determine all questions in respect to the claim."); *see also DeNuptiis v. Unocal Corp.*, 63 P.3d 272, 277 (Alaska 2003) (noting board has broad powers to administer Alaska Workers' Compensation Act, including authority to formulate policy, interpret statutes, and "conduct its hearings in the manner by which it may best ascertain the rights of the parties." (citing AS 23.30.135(a))).

11. *See Kessick v. Alyeska Pipeline Serv. Co.*, 617 P.2d 755, 757 (Alaska 1980) ("[I]t is not the function of this court to reweigh the evidence but only to determine whether such evidence exists." (citing *Laborers & Hod Carriers Union, Local 341 v. Groothuis*, 494 P.2d 808, 811–12 (Alaska 1972))); *see also* AS 23.30.122, which provides:

   **Credibility of witnesses.**

> The board has the sole power to determine the credibility of a witness. A finding by the board concerning the weight to be accorded a witness's testimony, including medical testimony and reports, is conclusive even if the evidence is conflicting or susceptible to contrary conclusions. The findings of the board are subject to the same standard of review as a jury's finding in a civil action.

12. *Sea–Land Servs., Inc. v. State, Second Injury Fund*, 737 P.2d 793, 795 (Alaska 1987) (quoting *U.S. Pipe & Foundry Co. v. Caraway*, 546 S.W.2d 215, 219 (Tenn.1977)).

13. *Id.*

14. *Id.* (citing *Leiker v. Manor House, Inc.*, 203 Kan. 906, 457 P.2d 107, 113–14 (1969)).

15. *See* Op. at 991–92 (stating *Alaska International* went "too far" because "our opinion stated that [a] resume's reference to an injury failed to raise the inference that Alaska International knew of the employee's arthritis").

treatise.[16] I doubt that Larson intended the quoted passage to apply to written-records states like Alaska. The quoted passage is introduced by the preceding paragraph of the treatise.[17] The introductory paragraph states: "An obvious question in states requiring *actual employer knowledge* is: How much must the employer have known about the actual nature of the prior injury?"[18] As I read Larson, the passage quoted by the court was not meant to apply to a written-record jurisdiction like Alaska, and only applies to states requiring "actual knowledge" for Second Injury Fund claims.[19] Alaska is not such a state. The legislature adopted a written-record standard, not an actual-knowledge standard, for Second Injury Fund claims in Alaska. Written records are used in Alaska to impute knowledge but neither AS 23.30.205 nor our case law requires that the employer have actual knowledge of the contents of the record or the impairment. Larson's treatise distinguishes actual-knowledge jurisdictions from written-record jurisdictions, noting, among other things, that a "down-to-earth reason for disapproving the [actual-knowledge] rule is that it involves one of those distinctions that consume far more litigation time and cost than the policy at stake is worth."[20]

After revising the longstanding test in *Sea–Land Services* and *Alaska International*, the opinion proposes another standard that is potentially just as problematic. The opinion asserts that the underlying purpose of the Second Injury Fund

is satisfied if the employer's written record shows a preexisting permanent impairment that could reasonably be due to one of the conditions listed in AS 23.30.205(d)(1), even if the employer cannot precisely identify the specific medical condition. In other words, if the written record shows that an employee had a permanent or chronic condition that could be a hindrance to employment, the written record requirement would be satisfied.... If an employee disclosed that she had "knee problems" and had undergone knee surgery and a laminectomy, the written record would be satisfied, even though the employer did not know the specific reason for the laminectomy or knee problems. Or if an employee takes sick leave over the years for back problems and this is recorded in the employer's files, the employer shows that it had knowledge of the impairment, even if the employer does not know that the employee had degenerative disk disease.[21]

This passage may seem unexceptional at first glance; a legislature might rationally choose to base Second Injury Fund claims on just such a standard. But this passage is problematic, given the text of the statute and what we have said about the statute.

First, this passage seems to change the analysis required by statute and case law. Our statute requires a qualifying impairing condition and lists specific conditions that qualify.[22] It requires the employer to establish by its written records that it "had knowledge of *the* permanent physical impairment

**16.** *Id.* at 989 (quoting 5 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law § 91.03[3] (2000)).

**17.** The footnotes omitted from the Larson passage quoted by the court state that "[a]lthough the New York cases on this point are no longer operative since the 1987 deletion of the knowledge requirement, they are retained for whatever value they may have in states still having that requirement." 5 Larson, *supra* note 16, § 91.03[3]. Because the written-record requirement of AS 23.30.205 implicitly rejects an actual-knowledge requirement, the inoperative New York case law has no relevance in our jurisdiction. *See id.* § 91.03[5]-[6], D[6] (describing *Sea–Land Servs.*, 737 P.2d at 793, and noting Alaska requires written record).

**18.** *Id.* § 91.03[3] (emphasis added).

**19.** 5 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law § 91.03[3] (2000). Nebraska, for example, provides an actual knowledge exception to the written-record requirement: "[I]n the case of an obvious injury inevitably leading to undisputed actual knowledge on the part of the employer of the employee's preexisting permanent disability, such as an amputated arm, the written records requirement may be dispensed with." *Ashland–Greenwood Pub. Sch. v. Thorell*, 15 Neb.App. 114, 723 N.W.2d 506, 513 (2006).

**20.** *Id.* § 91.03[5].

**21.** Op. at 989–90 (footnotes omitted).

**22.** AS 23.30.205(d).

before the ... injury and that the employee was retained after the employer acquired that knowledge."[23] Likewise, the statute defines "permanent physical impairment" to mean "any permanent condition" of such seriousness as to hinder obtaining employment or reemployment;[24] it also makes it clear that a "condition" is not a "permanent physical impairment" unless it is one of the "following conditions" listed in subsection .205(d)(1).[25] The statute therefore requires that the employer have pre-injury knowledge of one of the qualifying conditions, and, per subsection .205(a), that this condition be a cause of or have contributed to the new employment injury. Actual advance knowledge, of course, is not required. Only imputed advance knowledge is required; the imputation is to be made from the employer's written records. If knowledge of a condition listed in the statute—here, arthritis—can be fairly and reasonably inferred from the records, the employer can recover from the fund if that condition causes or contributes to the subsequent injury. Before today, the issue in such a case was whether the written records could support an inference of an employer's "prior knowledge" of the qualifying condition that causes or contributes to the new injury.[26] But the court's opinion asserts that the purpose of the Second Injury Fund "is satisfied if the employer's written record shows a preexisting permanent impairment that *could reasonably be due to one of the conditions*" listed in the statute.[27] This formulation deviates from the substantive standard we adopted in *Sea–Land Services,* and is not obviously an equivalent paraphrase of that standard. Assuming the opinion's formulation is not intended to change the existing standard, it is not obvious that the two formulations, rigorously applied, will give identical results. If they do not, today's formulation will create confusion and diminish predictability in Second Injury Fund disputes.

Today's formulation may simply be intended to be an explanatory paraphrase of the existing standard. If so, it nonetheless seems to alter how such disputes are to be resolved. It seems to assume that it is sufficient that the records show a "permanent impairment that could reasonably be due" to one of the listed conditions. This formulation misdescribes the required analysis. It implies that it is sufficient that the permanent impairment itself "could reasonably be due" to the qualifying condition. But under the standard we adopted in 1987 the only occasion for taking reasonable inferences is when knowledge about the employee's condition at the time of hire or retention is being imputed to the employer; this inference does not aid the employer in establishing that the qualifying condition caused or contributed to the new injury. Also, subsection .205(d) uses "permanent physical impairment" and "permanent condition" or "condition" as equivalent terms. The statute as written makes it unnecessary to determine whether a permanent impairment "could reasonably be due" to one of the listed conditions.[28]

Second Injury Fund disputes arising out of records reflecting knee and "back problems"—the examples given by the court's opinion—would be for the board to resolve. Whether a given circumstance satisfies the statute is highly situational. This implies that it is uniquely for the board to weigh the evidence and determine whether the impairing condition listed in the statute is revealed in the employer's written records. That sort of situational dispute must be resolved on a case-by-case basis. This confirms that the ultimate standard of review (assuming no legal error) must be the substantial evidence standard.

Second, the opinion's use of the phrase "back problem[ ]"[29] as an illustrative exam-

---

**23.** AS 23.30.205(c) (emphasis added).

**24.** AS 23.30.205(d).

**25.** The only exception is a condition satisfying AS 23.30.205(d)(2). There is no contention that subsection applies here.

**26.** *Sea–Land Servs.,* 737 P.2d at 795.

**27.** Op. at 989 (emphasis added).

**28.** "Our function is not to re-draft the statute, but to enforce it according to its plain meaning." *Sea–Land Servs.,* 737 P.2d at 796 n. 3.

**29.** The court's opinion derives the "back problem[ ]" example from *Denton v. Sunflower Elec. Coop.,* 12 Kan.App.2d 262, 740 P.2d 98, 103

ple seems contrary to what we have said about very general information concerning health conditions. We have said that a "general reference to an 'injury' utterly fails to raise an inference ... [of a] preexisting permanent physical impairment." [30] The phrase "back condition" lacks precision and using it as an example suggests that colloquial statements will support (or will be deemed by this court to support) a fair and reasonable inference of a qualifying condition. Because "back problem" is a common expression used to encompass a variety of permanent and non-permanent disabilities, the example used by the opinion potentially encourages Second Injury Fund claims that would not previously have succeeded.

The opinion states that "the term 'back problems' ... is the type of information that an employee is likely to give to his employer" and that "[i]f an employer is aware of an employee's medical problems and records them in everyday language, that employer still satisfies the written record requirement." [31] The opinion is arguably correct when it states that employees are not likely to provide employers with information that is medically precise or that exactly matches the statute's list of qualifying conditions. But the type of information employers receive and record is not necessarily germane to the board's determination. Again, the written-record requirement can only be satisfied if the board determines that the written record

could support an inference of an employer's "prior knowledge" of a qualifying condition that causes or contributes to the new injury.

The court faults the board for "requiring VECO to present evidence that showed unequivocally that VECO knew Huizenga had arthritis rather than simply a permanent impairment...." [32] This passage can be interpreted several different ways. It is probably intended to say that the board erred by requiring VECO to prove that the records revealed the specific condition of arthritis, i.e., that the records named arthritis. But the board imposed no such requirement. And because its decision approvingly summarized past board cases in which the records did not name the specific condition, it is fair to assume the board did not depart from its past practice.

This passage could be interpreted to say that the board erred by requiring VECO to prove that the records revealed a permanent impairment that turned out to be arthritis. But that is what the statute and our past decisions require. And that is what the board did, without error. The board could not have permitted VECO to prove its claim with evidence the records revealed a permanent impairment that was unrelated to arthritis. That would be an incorrect interpretation of what the statute requires. [33] It would have been error for the board to have interpreted the statute in that fashion. [34]

---

(1987). Op. at 990 n. 34. Because Kansas law allows employers to establish knowledge of an employee's pre-existing impairment through either written records or actual knowledge, the example is inapt and inapplicable to Alaska's statutory scheme. *See* Kan. Stat. Ann. § 44–567(b) (2006) ("The employer's knowledge of the preexisting impairment may be established by any evidence sufficient to maintain the employer's burden of proof with regard thereto."); *Denton*, 740 P.2d at 101–03 (employer's knowledge of employee's injury was established by witness testimony and corroborated by business records).

**30.** *Alaska Int'l Constructors v. State, Second Injury Fund*, 755 P.2d 1090, 1094 (Alaska 1988) (written record insufficient to support inference of permanent impairment where writing stated "I was injured on the job by a sheet of iron.... My injury has been corrected by surgery and I was released with no restrictions by my doctor to

return to work."); *see also Sea–Land Servs.*, 737 P.2d at 795–96.

**31.** Op. at 990.

**32.** Op. at 988.

**33.** Subsection .205(c) requires the written records to show the "employer had knowledge of *the* permanent impairment...." (Emphasis added.)

**34.** Thus, records revealing a history of past cardiac problems putting an employer on notice of permanent impairment would not satisfy subsection .205(c) if the disabling condition, for example cerebral palsy, was unrelated to the conditions to be inferred from the employer's records. Likewise, records revealing impairment from knee problems would not satisfy the statute if a ruptured intervertebral disc causes the new disability.

Finally, the court's own remand instructions confirm that the board did not err. The court states that the board on remand "must determine whether VECO's knowledge that Huizenga had a permanent physical impairment can fairly and reasonably be inferred from [what Huizenga told VECO]."[35] But as I read the board's decision, that is exactly the issue the board decided. We should therefore affirm.

For these reasons, I respectfully dissent.

## APPENDIX A

The Alaska Supreme Court has instructed the Board to only consider whether a fair and reasonable inference can be drawn, and thereby imparted to the employer, from the written records. Based on the above, the Board finds the employer in the instant case is not entitled to SIF reimbursement. The employee, in the instant case, was not informed that he had arthritis until September 2004. This was long after he had submitted hiring and employment documents to the employer. The Board further finds that the employer has not provided written proof that it hired or retained the employee after it had written notice that the employee had a qualifying pre-existing impairment before he was injured on October 15, 2000. The Alaska Supreme Court has determined the employer must show knowledge of a permanent impairment. *Alaska International Constructors.*[1] This case is directly on point as far as the instant case is concerned. The Board finds that the employer's written record that the employee had prior back injuries and surgeries, and nothing more, does not reasonably connote a preexisting arthritic condition and therefore is insufficient as a matter of law to establish the employer's written notice of a pre-existing qualifying disability. Both Drs.

Voke and Klimow reached their conclusions regarding the employee's conditions based on their knowledge of the employee's medical records and conditions and not from his Health Questionaires. The employee's written description of "back operation, compression 5 lower vertebrae, Dec. 21, 1987, Dr. Voke" and his written disavowal on the same Health Questionnaire that he had any arthritic condition negates any argument by the employer that the employee's 1996 and 1997 Health Questionnaires put them on written notice that the employee had a qualifying permanent disability of arthritis before he was injured October 15, 2000. The Board finds that the employer has not met its burden of proof by a preponderance of the evidence[2] with respect to the statutory requirements of AS 23.30.205 by showing knowledge by the employer of the employee's handicapping condition prior to his October 15, 2000 injury. For these reasons, the employer's request for reimbursement under the SIF is denied. Because of the denial based on the employer's lack of knowledge of the employee's condition prior to his October 15, 2000 injury is upheld, this order does not address the other bases for denial addressed in the SIF denial letter of May 18, 2004.

---

**35.** Op. at 992. Stated somewhat more accurately, the question is *whether* VECO had knowledge of a permanent physical impairment based on fair and reasonable inferences to be drawn from what Huizenga told VECO. The court, in phrasing the remand instruction, no doubt does not mean to assume that VECO indeed had knowledge of a permanent impairment; there was no evidence VECO had that actual knowledge; the entire dispute was and is whether that knowledge is imputable to it from its written records.

**1.** *Alaska International Constructors* at 1090.

**2.** In the instant dispute, the Alaska Workers' Compensation Act provides no specific standard of review. In the absence of a specific standard, we apply the general "preponderance of the evidence" standard provided by the Alaska Administrative Procedure Act, AS 44.62.460(e). *See De-Nuptiis v. Unocal Corp.,* 63 P.3d 272 (Alaska 2003).