897 P.2d 643

**SPECIAL FUND DIVISION, Petitioner,**

v.

**INDUSTRIAL COMMISSION OF ARIZONA, Respondent,**

**Department of Corrections, Respondent Employer,**

**State Compensation Fund, Respondent Carrier,**

**Janet K. Morin, Respondent Employee.**

**No. 1 CA–IC 92–0154.**

Court of Appeals of Arizona, Division 1, Department D.

Aug. 30, 1994.

Reconsideration Denied Dec. 20, 1994.

Review Denied June 29, 1995.

342

Industrial Com'n of Arizona, Special Fund Div. by Laura L. McGrory and Michael A. Mosesso, Phoenix, for petitioner.

Industrial Com'n of Arizona by Anita R. Valainis, Chief Counsel, Phoenix, for respondent.

Long, Lester & Lundmark by James B. Long, Phoenix, for respondents Employer and Carrier.

Robert E. Wisniewski, Phoenix, for respondent Employee.

## OPINION

McGREGOR, Judge.

The Special Fund Division (Special Fund) challenges the Arizona Industrial Commission's (Commission) order rearranging Janet K. Morin's (applicant) permanent disability benefits and apportioning liability for these benefits between itself and the State Compensation Fund (carrier). The Special Fund asserts that the administrative law judge lacked jurisdiction to apportion applicant's rearranged permanent disability benefits because carrier failed to comply with the notice requirement in Arizona Revised Statutes Annotated ("A.R.S.") section 23–1065 subd. D (Supp.1993). The Special Fund also argues that, if jurisdiction existed, the administrative law judge erred in determining that applicant's preexisting physical impairment constitutes "a hindrance or obstacle to employment or to obtaining reemployment" and in finding that applicant's employer had "knowledge" of her preexisting permanent impairment. Because we conclude that carrier's failure to comply with the notice requirement in section 23–1065 subd. D is not a jurisdictional defect and the record supports the administrative law judge's finding that applicant's impairment constitutes a hindrance or obstacle to her reemployment and that her employer knew about her impairment, we affirm the award.

## I.

On September 8, 1989, while working as a correctional service officer for the Department of Corrections (DOC), applicant tripped over a curb and injured her lower back. Applicant's injury ultimately required surgery to repair a herniated disc at L5–S1. Carrier accepted applicant's claim for workers' compensation benefits on October 30, 1989. On February 12, 1990, applicant returned to DOC on a regular work status.

On March 13, 1990, carrier closed applicant's claim, finding that applicant suffered a permanent impairment but recommending a "no loss" award because she returned to work without a reduction in her earning capacity. Carrier subsequently filed a notice of permanent disability and request for determination of benefits, using Industrial Commission Form 107. Carrier did not indicate on Form 107 that it planned to request apportionment pursuant to section 23–1065, subd. C. On May 17, 1990, the Commission issued a no loss award, which became final without protest from applicant.

Meanwhile, applicant's symptoms recurred and on June 20, 1990 her doctor placed her on a "no work" status until July 13, 1990. After unsuccessfully attempting to return to work, applicant resigned from DOC on July 19, 1990. She then filed petitions with carrier to reopen and to rearrange her September 1989 claim. Following carrier's denial of both petitions, applicant filed a request for hearing with the Commission. At a hearing on April 1, 1990, applicant abandoned her request for reopening and proceeded with her claim for rearrangement. Carrier requested a continuance to allow it to notify the Special Fund of its intent to claim apportionment pursuant to section 23–1065, subd. C. Carrier notified the Special Fund on June 11, 1991.

Carrier based its claim for apportionment on injuries applicant sustained during her previous career in the military. While in the Air Force, applicant injured her left knee in 1959, reinjured it in 1977, and underwent left knee surgery for a prepatellar cyst in January 1982. She also injured her right knee in 1961, and a physician diagnosed right knee chondromalacia by 1963. In addition, applicant injured her lower back, which required a laminectomy and disc surgery in June 1962 for a herniated disc at L5–S1. Although applicant returned to regular duty following each of these injuries, when she retired she received a Veterans Administration service-connected disability rating of 60 percent, one component of which was a 10 percent rating for degenerative joint disease of the lumbosacral spine, left knee, and right foot.[1]

The Special Fund responded to carrier's notice by asserting, as an affirmative defense, that carrier's delayed notice barred its claim for apportionment. The Special Fund also requested and received a continuance to prepare its defense. Pending the apportionment hearings, both parties conducted independent medical examinations to evaluate applicant's preexisting impairment.

During the apportionment hearing, applicant testified and both parties presented testimony from a medical examiner and a labor market specialist. On May 26, 1992, the administrative law judge issued an award rearranging applicant's permanent disability benefits and apportioning liability for her stipulated loss of earning capacity between the Special Fund and carrier. Rather than making specific findings of fact or conclusions of law, the administrative law judge incorporated the carrier's post-hearing memorandum and on this basis concluded that the evidence satisfied each of the statutory requirements for apportionment. The administrative law judge affirmed without modification on administrative review. The Special Fund then brought this action. We have jurisdiction pursuant to A.R.S. sections 23–951 (1983) and 12–120.21, subd. B (1992) and Rule 10, Rules of Procedure for Special Actions.

## II.

The Special Fund first asserts the administrative law judge lacked jurisdiction to ap-

---

1. The other components of her disability rating were a hysterectomy and hypothyroidism. Applicant did not receive a rating for her laminectomy or for her right knee chondromalacia because she had no "compensable symptomatology" during her military duty.

portion applicant's rearranged permanent disability benefits because carrier failed to comply with the notice requirement in A.R.S. section 23–1065, subd. D. Under section 23–1065, subd. D, a carrier "shall" notify the commission of its intent to claim apportionment within thirty days after it closes an applicant's claim with a finding that the applicant suffered a permanent impairment.[2]

■ In reviewing an administrative law judge's decision, this court may draw its own legal conclusions in determining whether the Commission properly interpreted the law and applied it to the facts. *See Hunt Bldg. Corp. v. Industrial Comm'n,* 148 Ariz. 102, 105–06, 713 P.2d 303, 306–07 (1986). Our goal in interpreting statutes is to effectuate the intent of the legislature. *State Compensation Fund v. Nelson,* 153 Ariz. 450, 453, 737 P.2d 1088, 1091 (1987). The language of the statute provides the primary evidence of legislative intent. *Id.* We also infer intent from the statute's context, its effects and consequences, and its spirit and purpose. *See City of Tucson v. Superior Court,* 165 Ariz. 236, 240, 798 P.2d 374, 378 (1990). Although we draw our own legal conclusions, we give an agency's interpretation of a statute great weight. *Capitol Castings, Inc. v. Arizona Dep't of Economic Sec.,* 171 Ariz. 57, 60, 828 P.2d 781, 784 (App.1992).

■ We conclude that the legislature did not intend that a carrier's failure to provide timely notice of its intent to claim apportionment would necessarily bar the carrier from asserting this claim at a later time. Section 23–1065, subd. D is silent regarding the consequence of failing to provide timely notice. We interpret this silence as evidence that the legislature did not intend us to construe the notice requirement in section 23–1065, subd. D as a jurisdictional prerequisite. If the

legislature had intended to bar a carrier's claim for apportionment unless it provided notice of its intent to claim apportionment within thirty days of closing an applicant's claim, it could have expressed this intention unambiguously.[3]

Our analysis of the purpose of the notification requirement in section 23–1065, subd. D also leads us to reject the Special Fund's position. The purpose of linking the notice of intent to claim apportionment with the Form 107 notice of permanent disability is to allow the Special Fund to participate in proceedings that affect its liability. In some instances, the approach urged by the Special Fund actually would frustrate its ability to participate at the time its interest becomes apparent. If a carrier must provide notice of an intent to claim apportionment in an apparent no loss award case, that notice would be the only notice received by the Special Fund, since nothing in the statute requires the carrier to again notify the Special Fund of its intent to claim apportionment if an applicant subsequently petitions to rearrange a claim. As a result, the Special Fund would not receive notice at the very time it needs an opportunity to participate in the proceedings.

The Special Fund argues that untimely notice can be prejudicial because the delay may prevent it from acquiring evidence to prepare its case. The Special Fund concedes, however, that the delay in this case did not prejudice its defense against carrier's claim for apportionment. Although we acknowledge that rearrangements may occur years after closure, we disagree that the appropriate remedy for possible prejudice to the Special Fund in some future case is to erect a universal bar to all requests for apportionment made more than thirty days after closure.

---

2. In relevant part, section 23–1065, subd. D provides that "[t]he employer or insurance carrier shall notify the commission of its intent to claim reimbursement for an eligible claim under subsection B or C of this section not later than the time the employer or insurance carrier notifies the commission pursuant to § 23–1047, subsection A." In turn, A.R.S. section 23–1047, subd. A (1983) requires a carrier to notify the commission and request a determination of permanent disability within thirty days after an industrial injury becomes stationary.

3. A.R.S. section 23–1065, subd. E (Supp.1993), for example, which requires the Special Fund to approve third-party settlements, provides that "[f]ailure to obtain the written approval of the special fund shall not cause the injured worker to lose any benefits but ends the special fund's liability for reimbursement and makes the employer or carrier solely responsible for the payment of the remaining benefits."

■ We also reject the Special Fund's argument that this interpretation conflicts with Arizona Administrative Code R4–13–132 (1993) ("Rule 132"). Rule 132 provides that if the carrier does not give the required notice, "the Commission shall not be bound by the testimony and evidence presented at a hearing as it relates to the imposition of liability upon the Special Fund." Although Rule 132 allows the Special Fund to dispute determinations of permanent disability or of liability for apportionment if it did not receive the notice necessary for it to participate in the determination process, the rule does not bar all apportionment claims if a carrier fails to provide timely notice.

For the foregoing reasons, we reject the Special Fund's assertion that the administrative law judge lacked jurisdiction to apportion applicant's rearranged permanent disability benefits.

### III.

Next, the Special Fund asserts that the administrative law judge erred in determining that applicant's claim is apportionable.

### A.

■ A rule of nonapportionment generally applies to workers' compensation claims. *Morrison–Knudsen Co. v. Industrial Comm'n,* 115 Ariz. 492, 494–96, 566 P.2d 293, 295–97 (1977) (denying apportionment and imposing entire liability on second injury carrier even though disability aggravated by prior impairment). This rule, however, provides employers with a strong financial disincentive to employ handicapped workers. 2 Arthur Larson, *The Law of Workmen's Compensation* § 59.31(a) (1994). To counterbalance this effect and to encourage employers to hire handicapped workers, the legislature enacted the apportionment statute, A.R.S. section 23–1065, subd. C. *State Compensation Fund v. Harris,* 26 Ariz.App. 9, 10, 545 P.2d 971, 972 (1976).

Under section 23–1065, subd. C, a carrier can request the Industrial Commission to apportion an applicant's loss of earning capacity equally between the carrier and the Special Fund. A.R.S. § 23–1065, subd. C.4

(Supp.1993). The Special Fund pays apportionment claims from funds it generates from workers' compensation premium taxes imposed on all workers' compensation insurance carriers. A.R.S. § 23–1065, subd. A (Supp. 1993). The amount available to the fund is limited and serves multiple purposes, including payment of supportive care claims, uninsured employer claims, and vocational rehabilitation benefits. *See* A.R.S. §§ 23–1062, subd. A (1983), 23–907, subd. B (Supp.1993), 23–1065, subd. A (Supp.1993).

■ To obtain apportionment under section 23–1065, subd. C, a carrier must establish that (1) the applicant has a nonindustrial preexisting physical impairment due to one of the statute's enumerated conditions; (2) this impairment rates at least 10 percent when evaluated in accordance with the American Medical Association's (AMA) guides; (3) this impairment constitutes a hindrance or obstacle to employment or reemployment; and (4) written records indicate that the employer knew of the impairment when it hired the applicant or retained the applicant after learning of the impairment. Although the Special Fund contested each of these four criteria before the administrative law judge, on appeal the Special Fund limits its argument to whether carrier established criteria (3) and (4).

### B.

Because the Special Fund concedes applicant sustained a nonindustrial physical impairment that rated at least 10 percent under the AMA guides, the critical issue on appeal is whether that impairment constitutes a "hindrance or obstacle" to applicant's employment or reemployment, as required by criterion (3). Neither Arizona's statute nor the Model Act, from which it was adapted, defines this requirement. A.R.S. § 23–1065, subd. C (Supp.1993); Model Workmen's Compensation and Rehabilitation Law (Revised) § 20 (1974) *reprinted in* 4 Arthur Larson, *The Law of Workmen's Compensation,* at 670–72 (1994).

In its post-hearing memorandum incorporated by the administrative law judge, carrier argued that the court should apply an

objective test in determining whether an applicant's impairment constitutes a hindrance or obstacle. According to carrier, the appropriate test is whether a reasonable employer, knowing all the facts, would hesitate to employ, retain, or promote a worker with this impairment. Additionally, carrier argued that because the proper test is an objective one, an applicant's vocational history is irrelevant to making that determination. Carrier further asserted that this applicant's 60 percent service-connected disability rating conclusively establishes that her impairment is earning capacity disabling. Finally, carrier urges us to adopt a liberal standard in deciding whether to permit apportionment, since the purpose of the statute is remedial.

The Special Fund, in contrast, argues that we should apply a strict, rather than a liberal, standard because limited funds are available to carry out the multiple purposes it serves. The Special Fund contends that in determining whether a preexisting impairment constitutes a hindrance or obstacle, the court must determine whether a particular worker's impairment actually hindered that worker's ability to secure, retain, or advance in employment. In short, the Special Fund urges that the court must apply a subjective test and that a carrier must show a vocational history of adverse effect on employment to obtain apportionment.

In *Country Wide Truck Serv. v. Industrial Comm'n*, 181 Ariz. 410, 891 P.2d 877 (Ariz. App.1994), Division Two recently addressed this issue and adopted an objective test. Particularly, the court held that an employee's impairment constitutes a hindrance or obstacle when "the impairment is such that an employer who knew of it and its extent would more likely than not significantly consider it when making a decision to hire or retain the employee." 181 Ariz. at 412, 891 P.2d at 879.

■ In reaching this decision, the court reasoned that an objective test would allow employers and their insurance carriers to more easily compute their potential liability under the apportionment statute. The court concluded that a subjective test, in contrast, would create litigative uncertainties and increase costs, thereby discouraging employ-

ment of impaired workers. *Id.* 181 Ariz. at 411–13, 891 P.2d at 878–80 (quoting *Employers Commercial Union Ins. Group v. Christ*, 513 P.2d 1090, 1093 (Alaska 1973)). We agree with Division Two's analysis and therefore conclude that the administrative law judge correctly applied an objective test in determining whether applicant's impairment constitutes a hindrance or obstacle to her employment or reemployment.

### C.

■ Having concluded that an objective test applies, we now examine the Special Fund's contention that the administrative law judge erred in finding that applicant's preexisting conditions constitute a hindrance or obstacle. In reviewing an administrative law judge's decision, we consider all evidence in the light most favorable to sustaining the judge's decision, and we will sustain the decision if it is reasonably supported by the evidence. *Hunt Bldg. Corp.*, 148 Ariz. at 106, 713 P.2d at 307.

Although applicant continuously found employment in positions that required physical exertion following her retirement from the military, the administrative law judge reasonably could discount applicant's unaffected vocational history. Both the independent medical experts testified that, due to applicant's back and knee conditions, they would advise her to avoid heavy and repetitive work. Additionally, the Special Fund's rehabilitation counselor, Thomas M. Mitchell, admitted during cross-examination that employers are reluctant to hire a worker who has had back surgery and believe that injured workers present greater risks for reinjury or aggravated disability. He also opined that applicant's military experience had given her a competitive advantage in obtaining employment at the VA hospital and with DOC. We conclude that the record supplies a reasonable basis for the administrative law judge's decision that applicant's impairment constitutes a hindrance or obstacle to her reemployment.

### IV.

■ Finally, the Special Fund contends the administrative law judge erred in finding

that applicant's employer had "knowledge" of her preexisting permanent impairment. Again, this court will not reweigh the evidence, but will review it only to determine if the administrative law judge's decision is reasonably supported. *Hunt Bldg. Corp.*, 148 Ariz. at 106, 713 P.2d at 307.

Under section 23–1065, subd. C.2, an employer must establish "by written records" that it had "knowledge of the permanent impairment at the time the employee was hired, or that the employee continued in employment after [it] acquired such knowledge." Division Two liberally construed this requirement in *Country Wide Truck Serv.*, finding that a document from the employer's employee benefits representative indicating that the employee previously had undergone a lumbar laminectomy and a posterior cervical fusion satisfied the knowledge requirement. 181 Ariz. at 412, 891 P.2d at 879.

To support this conclusion Division Two cited *Kennecott Copper Corp. v. Chavez*, 111 N.M. 366, 805 P.2d 633 (App.1990), in which New Mexico's equivalent of the Special Fund argued that an employer's knowledge that a worker injured his knee, had surgery, and required nine months of recuperation before returning to work was insufficient to establish actual knowledge of the preexisting impairment, especially when there was no evidence that the worker walked with a limp or had difficulty in performing his tasks. In rejecting this argument, the court agreed that in some cases an employer's knowledge of an injury and subsequent medical treatment does not allow an inference that the employer knew of the worker's impairment. The court held, however, that when the injury is serious or of a particular type, an inference of knowledge is well founded based on mere knowledge of the injury and subsequent treatment. The court then found that the worker's knee injury, which required surgery to remove part of his cartilage, was the type of injury that permitted an inference that the employer knew of the impairment. 111 N.M. at 370–71, 805 P.2d at 637–38.

The facts here are similar to those considered in *Country Wide Truck Serv.* As part of her latest employment application to DOC,

applicant completed a medical history questionnaire in which she reported that she had "knee problems," that she had undergone "knee surgery" in January 1982 and a "laminectomy" in June 1962.[4] We believe these are the type of injuries that permit an inference that DOC knew of applicant's preexisting permanent impairment and decided to hire her despite the fact that she might have difficulty in performing her tasks, which included extensive walking, climbing 1000 stairs a shift, and some moderate to heavy lifting, and presented some potential for reinjury. *See Kennecott Copper Corp.*, 111 N.M. at 371, 805 P.2d at 638. We conclude, under these facts, that the evidence reasonably supports the administrative law judge's finding that DOC had knowledge of applicant's impairment.

## V.

For the reasons stated above, we affirm the award.

GERBER, P.J., and GRANT, J., concur.

---

**4.** DOC personnel inserted "O.K." next to the reference to knee problems.