NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

BRENT TYLER ROBISON, DDS, *Plaintiff/Appellant*,

*v.*

ARIZONA STATE BOARD OF DENTAL EXAMINERS,
*Defendant/Appellee*.

No. 1 CA-CV 14-0533
FILED 11-24-2015

Appeal from the Superior Court in Maricopa County
No. LC2013-000484-001
The Honorable Crane McClennen, Judge

**AFFIRMED IN PART AND VACATED IN PART**

COUNSEL

Jeffrey J. Tonner, LLC, Phoenix
By Jeffrey J. Tonner
*Counsel for Plaintiff/Appellant*

Arizona Attorney General's Office, Phoenix
By Mary DeLaat Williams, Michael Raine
*Counsel for Defendant/Appellee*

_____

**MEMORANDUM DECISION**

Presiding Judge Randall M. Howe delivered the decision of the Court, in which Judge Jon W. Thompson and Judge Lawrence F. Winthrop joined.

_____

**H O W E**, Judge:

¶1          Dr. Brent Tyler Robison, a licensed orthodontist, appeals the superior court's order affirming sanctions imposed against him by the Arizona State Board of Dental Examiners ("Board"). For the reasons that follow, we affirm the Board's conclusions that Dr. Robison engaged in unprofessional conduct relating to his billing of Banner patients, quality of care for patient J.H., and patient recordkeeping. However, we vacate the Board's conclusion that Dr. Robison engaged in unprofessional conduct regarding the quality of care for patient Q.C.

## FACTS AND PROCEDURAL HISTORY

¶2          Banner Health Corporation ("Banner") employees are eligible to participate in a self-insured dental plan under which the employees pay a premium to Banner in exchange for a lifetime benefit for orthodontic treatment. Under this plan, Banner pays the provider directly for half of an employee's orthodontic treatment and the employee pays the remainder. However, Banner's financial obligation is limited to $5,000 for each participating employee's lifetime orthodontic treatment.

¶3          Dr. Robison owns and operates a private orthodontics practice that treats employees participating in the Banner plan. Some of Dr. Robison's Banner patients enlist in his extended treatment plan, which offers patients a "lifetime warranty and care plan for all . . . orthodontic needs" for a total treatment cost of $9,980. Dr. Robison's lifetime warranty on orthodontic treatment is unique to this plan and is not commonly offered by other orthodontists.

¶4          In 2010, the Board received an anonymous complaint alleging that Dr. Robison committed fraud by not "balance billing" his Banner patients. That is, Dr. Robison allegedly billed Banner $9,980 for a Banner patient's treatment and collected Banner's half of the fee but not the patient's. The Board investigated Dr. Robison's billing practices.  The panel found that Dr. Robison had failed to "balance bill" 330 Banner patients and

had consequently overbilled Banner $679,269.92. It recommended that the Board find that Dr. Robison's billing practices constituted unprofessional conduct. In response to this investigation, Dr. Robison consulted Banner's in-house counsel who opined that Dr. Robison did not have to collect co-payments from Banner patients and that Dr. Robison had submitted and paid claims according to the Banner plan.

¶5         The Board held a public meeting with Dr. Robison to consider the investigative panel's recommendations. During this meeting, a Board member informed Dr. Robison that the Board's executive director had communicated with an unidentified person in Banner's benefits department. This person disagreed with the in-house counsel's advice and stated that Banner intended for it and the patient to each pay a half of the total treatment cost. Dr. Robison objected to this information for lack of due process and requested that it be disregarded. The Board agreed and decided to "table" the matter to collect more information. Additional investigation revealed more problems with Dr. Robison's practice, including deficiencies in his quality of care and patient recordkeeping for thirteen patients. The Board issued a complaint alleging that these findings constituted unprofessional conduct under the Dental Practice Act.

¶6         An Administrative Law Judge ("ALJ") conducted a hearing on the Board's complaint. Regarding the billing of his Banner patients, Dr. Robison testified that when a Banner patient enlisted in his extended treatment plan, the contract "would be set up for Banner . . . to pay 50%, and the patient to pay 50%." Dr. Robison stated, however, that he had no intention of collecting the patient's share of the $9,980 total treatment cost and that his staff would inform Banner patients that, by enlisting in that plan, they would incur "no out-of-pocket costs." He further testified that if an enlisted patient began making payments but later stopped, Dr. Robison wrote off the balance but did not subtract the resulting discount from the total treatment cost submitted to Banner. Dr. Robison admitted that this subtraction should "ideally" be done.

¶7         To refute the allegation of fraudulent intent, Dr. Robison referred to the advice of Banner's in-house counsel and to a written summary of a meeting with Banner's reimbursement supervisor regarding a claims report, which states that Dr. Robison's claims were "paid based on the plan." However, a Banner benefits compliance consultant, who also attended the meeting, testified that during the meeting he advised Dr. Robison that Banner "care[d]" whether Dr. Robison collected co-payments and assumed that he did. He also testified that if a Banner patient received a discount from the orthodontist, either before or after

submitting the claim to Banner, Banner would expect to receive the same discount. The benefits compliance consultant stated that claims that did not reflect the discount to Banner were fraudulent and inaccurate.

¶8          Regarding quality of care, the Board presented expert testimony from Dr. Cliff Running who opined on the quality of care for thirteen of Dr. Robison's patients, including, as relevant here, patients J.H. and Q.C. He testified that portions of Dr. Robison's diagnosis for J.H. were incorrect and noted that J.H.'s treatment included extracting J.H.'s tooth number four, which was not within the standard of care because it left J.H.'s teeth unbalanced. Dr. Running further testified that he felt "perplexed" why Dr. Robison took "out one tooth and put a [Temporary Anchorage Device] in there." He stated that the standard of care required Dr. Robison to balance J.H.'s teeth by extracting four teeth, not just one. Dr. Running explained that extracting only one tooth negatively affected J.H.'s bite. Dr. Robison pointed out that Dr. Running looked at the patient's films backwards during his testimony, but Dr. Running explained that this did not affect his testimony.

¶9          Regarding Q.C., Dr. Running testified that Dr. Robison extracted tooth number 30 as part of Q.C.'s treatment. Dr. Running testified that Dr. Robison's "very, very paltry" treatment notes for Q.C. fell below the standard of care and that no documented justification for the tooth extraction existed. In fact, Dr. Running stated that because Dr. Robison's treatment notes for Q.C. did not include justification for the extraction or a treatment plan, Dr. Running could not opine whether the tooth should have been extracted: "[I]t would be just a guess."

¶10          For all thirteen of Dr. Robison's patients discussed at the hearing, Dr. Running testified that Dr. Robison's patient treatment records were inadequate under the standard of care because they lacked films, molds, treatment plans, and health histories. Dr. Running stated that Dr. Robison's patient records fell below the standard of care particularly because they lacked cephalometric films. In response, Dr. Robison's expert, Dr. Robert Boyd, opined that orthodontists no longer typically use cephalometric films and that their exclusion from the patient records did not fall below the standard of care. However, Dr. Boyd admitted that he could not opine whether Dr. Robison's quality of care for six patients, including J.H. and Q.C., was within the standard of care because the patient records were otherwise incomplete.

¶11          The ALJ concluded that Dr. Robison engaged in unprofessional conduct regarding his: (1) billing practices in violation of

A.R.S. § 32–1201.01(15) and (16); (2) quality of care for patients J.H. and Q.C. in violation of A.R.S. § 32–1201.01(14); and (3) patient records for thirteen patients in violation of A.R.S. § 32–1201.01(24).[1] The ALJ recommended that the Board revoke Dr. Robison's license subject to a five year stay during which Dr. Robison should be on disciplinary probation. The ALJ also recommended that Dr. Robison pay a $10,000 administrative penalty.

¶12 The Board adopted the ALJ's recommendation and further ordered that Dr. Robison submit to quarterly billing and patient record audits during his probation period. The Board also ordered Dr. Robison to complete an ethics course and pay $3,000 to cover the expense of the hearing. Dr. Robison moved for reconsideration, but the Board denied it. He then appealed the Board's order to the superior court, but the superior court affirmed. This appeal followed.

## DISCUSSION

¶13 Dr. Robison argues that insufficient evidence supports the Board's order. The superior court's review of an agency decision is limited to whether substantial evidence supports the decision and whether it is contrary to law, arbitrary and capricious, or an abuse of discretion. A.R.S. § 12–910(E). "If an agency's decision is supported by the record, substantial evidence exists to support the decision even if the record also supports a different conclusion." *Gaveck v. Ariz. State Bd. of Podiatry Exam'rs*, 222 Ariz. 433, 436 ¶ 11, 215 P.3d 1114, 1117 (App. 2009). The trial court cannot sit as a "super agency" and substitute its own judgment for the agency's "where factual questions and agency expertise are involved." *DeGroot v. Ariz. Racing Comm'n*, 141 Ariz. 331, 336, 686 P.2d 1301, 1306 (App. 1984). In reviewing the superior court's ruling affirming an agency's order, we "independently examine the record to determine whether the evidence supports the judgment," under a preponderance of the evidence standard. *Webb v. State ex rel. Ariz. Bd. of Med. Exam'rs*, 202 Ariz. 555, 557 ¶ 7, 48 P.3d 505, 507 (App. 2002); Ariz. Admin. Code R2-19-119(A). Whether substantial evidence exists is a question of law for our independent determination. *Havasu Heights Ranch & Dev. Corp. v. Desert Valley Wood Prods., Inc.*, 167 Ariz. 383, 387, 807 P.2d 1119, 1123 (App. 1990). We view the evidence in the light most favorable to upholding the decision but are not bound by an agency's or the superior court's legal conclusions. *Special Fund Div. v. Indus. Comm'n*,

---

[1] The legislature has since replaced A.R.S. § 32–1201(21) with A.R.S. § 32–1201.01. *See* 2015 Ariz. Sess. Laws, ch. 196, §§ 1–2 (1st Reg. Sess.). We cite to the current versions of the relevant statutory provisions because no revisions material to this decision have occurred.

182 Ariz. 341, 346, 897 P.2d 643, 648 (App. 1994); *Sanders v. Novick*, 151 Ariz. 606, 608, 729 P.2d 960, 962 (App. 1986).

¶14 Here, substantial evidence supports the Board's conclusions that Dr. Robison engaged in unprofessional conduct in fraudulently obtaining fees by submitting materially false claims to Banner, causing a danger to patient J.H.'s health or safety, and failing to maintain adequate patient records.

## 1. Billing of Banner Patients

¶15 Dr. Robison first argues that insufficient evidence supports the Board's conclusion that he had a fraudulent intent in not collecting his Banner patients' shares of the total treatment cost, and that he conducted repeated irregularities in billing. The Board regulates dentistry in Arizona and may impose sanctions, including revocation of an orthodontist's license, for unprofessional conduct. A.R.S. §§ 32–1263.01(A)(1), –1263(A)(1). Under the Dental Practice Act, "unprofessional conduct" includes "repeated irregularities in billing," which means "submitting any claim . . . to any . . . third-party payor for dental services rendered that is materially false with the intent to receive unearned income as evidenced by . . . any [material] statement that . . . the licensee knows is false or misleading." A.R.S. § 32–1201.01(16), –1201(12)(e). It also includes "obtaining a fee by fraud or misrepresentation, or willfully or intentionally filing a fraudulent claim with a third party for services rendered or to be rendered to a patient." A.R.S. § 32–1201.01(15).

¶16 Here, substantial evidence supports the Board's conclusion that Dr. Robison submitted materially false claims of $10,000 to Banner for services rendered and obtaining a $5,000 fee by intentionally filing the fraudulent claim.[2] Dr. Robison testified that he submitted claims to Banner, a third-party payor, for a total treatment cost of $9,980, or another amount approaching $10,000. He submitted these claims to Banner knowing that he had no intention of collecting half of that cost from the patients themselves, as the Banner plan required. He also stated that if a patient began making payments but later stopped, he would write off the patient's balance and would not amend the claim to reflect the same discount for Banner. By

---

[2] Dr. Robison also argues that the Board erred in finding that he violated A.R.S. § 32–1201(12)(f) by abrogating the copayment provisions of a dental insurance contract. However, in concluding that Dr. Robison irregularly billed Banner, the Board found that he did so under subsection (e), not subsection (f). Consequently, we do not address this argument.

writing off and not collecting half of the total treatment cost, Dr. Robison effectively reduced the total treatment cost for the services rendered to less than $10,000. However, Dr. Robison submitted materially false claims for the full, un-amended amount to Banner intending to receive Banner's half. Consequently, Dr. Robison obtained a $5,000 fee—Banner's maximum benefit—from Banner by fraudulently misrepresenting to it the total treatment cost to be shared by Banner and the patient. The Banner benefits compliance consultant stated that this constituted fraud because Banner ultimately paid more than half of the patient's total treatment cost.

¶17         Dr. Robison counters that he did not have a fraudulent intent because he sought the advice of Banner's in-house counsel and the Banner reimbursement supervisor. However, the written summary from reimbursement supervisor indicates that their meeting involved a review of a claims report, not a review of the patient records that the Board examined during the hearing. Further, the record does not show that the in-house counsel reviewed the patient records in making his conclusion. Dr. Robison also argues that the Board's conclusion relied on the opinion of the "unnamed, undisclosed person of unknown authority" that Robison was informed of at the Board meeting. But the record shows that the Board based its decision on the evidence presented at the hearing, not on the opinion that the Board expressly disregarded at the Board meeting. Finally, Dr. Robison argues that the superior court erred in deferring to the Board's expertise regarding his billing practices because they are legal questions for the superior court's judicial consideration, not matters of agency expertise. However, the record shows that the superior court did not defer to the agency but instead determined that the evidence supported the agency's finding. Thus, the evidence supports the conclusion that Dr. Robison intentionally represented to Banner that the total treatment cost for Banner patients under the extended treatment plan was approximately $10,000, and though he knew that Banner required patients to pay half of that cost, he charged the patients less—or nothing at all—but collected the full $5,000 from Banner. Accordingly, substantial evidence supports the Board's conclusion that Dr. Robison engaged in unprofessional conduct under A.R.S. § 32–1201.01(15) and (16).

## 2. Quality of Care

¶18         Dr. Robison next argues that insufficient evidence supports the Board's conclusion that he engaged in unprofessional conduct regarding his quality of care for patients J.H. and Q.C. Under the Dental Practice Act, "unprofessional conduct" also includes "any conduct or

practice that constitutes a danger to the health, welfare or safety of the patient or the public." A.R.S. § 32–1201.01(14).

¶19 Here, sufficient evidence supports the Board's conclusion that Dr. Robison engaged in such conduct regarding J.H. Dr. Running testified that Dr. Robison incorrectly diagnosed portions of J.H.'s condition. He also testified that Dr. Robison's extraction of J.H.'s tooth number four was not within the standard of care because it left J.H.'s teeth unbalanced and it negatively affected his bite. Dr. Running opined that to be within the standard of care he would have extracted more than one tooth to balance J.H.'s bite. Dr. Robison's expert did not controvert this testimony. Dr. Robison argues that Dr. Running did not testify that the extraction of the tooth constituted a danger to J.H. However, because Dr. Robison's treatment left J.H. with unbalanced teeth and an affected bite, the record supports the Board's conclusion that it was a danger to J.H.'s health, welfare, or safety. Accordingly, substantial evidence supports the conclusion that Dr. Robison engaged in unprofessional conduct under A.R.S. § 32–1201.01(14) with respect to J.H.

¶20 Regarding Q.C., however, insufficient evidence supports the Board's conclusion that Dr. Robison's treatment constituted a danger to his health, welfare, or safety. Dr. Running testified that Dr. Robison extracted Q.C.'s tooth number 30, but that his treatment notes fell below the standard of care because they did not provide a justification for the extraction. Because Dr. Robison's treatment notes lacked the justification and a treatment plan, Dr. Running could not opine whether the tooth should have been extracted, or whether the extraction itself constituted a danger to Q.C.'s health, welfare, or safety. Dr. Running's testimony only shows that Dr. Robison's recordkeeping with respect to Q.C. fell below the standard of care. *See Croft v. Ariz. State Bd. of Dental Exam'rs*, 157 Ariz. 203, 208, 755 P.2d 1191, 1196 (App. 1988) (noting that "inadequacy of the treatment plan and inadequacy of orthodontic treatment [are] two separate matters"). Thus, insufficient evidence supports the Board's decision, and the superior court erred in affirming it. Accordingly, we vacate the Board's conclusion regarding Dr. Robison's quality of care for Q.C. as well as the superior court's order affirming it.

### 3.  Patient Records

¶21 Finally, Dr. Robison argues that insufficient evidence supports the Board's conclusion that he committed unprofessional conduct by failing to maintain adequate records on thirteen of his patients. The Dental Practice Act defines "unprofessional conduct" to include, among

other things, "failing or refusing to maintain adequate patient records." A.R.S. § 32–1201.01(24). Adequate patient records include written records of, among other things, all diagnoses, evaluations, treatment notes and plans, health histories, prescriptions, and radiographs. A.R.S. § 32–1264(A).

¶22          Here, substantial evidence supports the Board's conclusion that Dr. Robison's patient recordkeeping constituted unprofessional conduct. The record shows that Dr. Robison's patient records did not contain study models, cephalometric films, patient health histories, or completed progress notes. Indeed, Drs. Running and Boyd admitted that they could not opine on Dr. Robison's treatment of some patients because of inadequate patient records. Dr. Robison counters that Dr. Running looked at some films backwards and that, contrary to Dr. Running's opinion, Dr. Boyd testified that orthodontists no longer typically use cephalometric films and that their exclusion does not fall below the standard of care. But we do not reweigh the evidence on appeal. *Elia v. Ariz. State Bd. of Dental Exam'rs*, 168 Ariz. 221, 226, 812 P.2d 1039, 1044 (concluding that substantial evidence may exist despite conflicting testimony). As Dr. Robison notes, "the Board is entitled to choose between conflicting experts."

¶23          Dr. Robison also counters that the record does not support the Board's conclusion because "no one complained about [his] treatment records and no one was harmed by his treatment." However, a complaint or harm is not necessary to find unprofessional conduct. Requiring a patient to be harmed by a licensee's conduct before imposing discipline would run contrary to the Board's purpose of protecting the public. *See Arizona State Bd. of Dental Exam'rs v. Hyder*, 114 Ariz. 544, 546, 562 P.2d 717, 719 (1977) ("The regulation of a profession is the exercise of the police power for the health and general welfare of the people of the State."). Accordingly, substantial evidence supports the Board's conclusion that Dr. Robison's patient recordkeeping was inadequate and constituted unprofessional conduct under A.R.S. § 32–1201.01(24).

**CONCLUSION**

¶24        For the foregoing reasons, we affirm the Board's conclusion that Dr. Robison engaged in unprofessional conduct relating to the billing of Banner patients, the quality of care for J.H., and patient recordkeeping. However, we vacate the Board's conclusion that Dr. Robison engaged in unprofessional conduct regarding the quality of care for Q.C. and the superior court's order affirming it. Because the remaining findings of unprofessional conduct sufficiently support the Board's imposed sanctions, we affirm the sanctions.



Ruth A. Willingham · Clerk of the Court
F I L E D : ama